NEW JERSEY STATE POLICEMEN'S BENEVOLENT ASS'N, LOCAL 29 (IRVINGTON P. B. A.), PLAINTIFF-RESPONDENT, v. TOWN OF IRVINGTON, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, ROBERT MILLER, IN HIS CAPACITY AS MAYOR OF THE TOWN OF IRVINGTON, AND THE TOWN COUNCIL OF THE TOWN OF IRVINGTON, DEFENDANTS-APPELLANTS.

Argued April 2, 1979—Decided June 12, 1979.

Mr. *Jacob Green* argued the cause for appellants (*Mr. Green,* attorney; *Ms. Ellen Harrison,* on the brief).

Mr. *Lawrence A. Whipple, Jr.,* argued cause for respondent (*Messrs. Zazzali, Zazzali & Whipple,* attorneys).

A brief was submitted on behalf of *amicus curiae* Firemen's Mutual Benevolent Association Local #14 (*Messrs. Rinaldo & Rinaldo,* attorneys; *Mr. Anthony D. Rinaldo, Jr.* of counsel and on the brief).

The opinion of the court was delivered by

PASHMAN, J. This case presents for review important issues concerning the interrelationship of the Local Government Cap Law, *N. J. S. A.* 40A:4–45.1 *et seq.,* and the compulsory interest arbitration provisions of the Employer-Employee Relations Act, *N. J. S. A.* 34:13A–14 *et seq.* First, we must decide whether costs incurred to implement compulsory arbitral awards need be taken into account by municipalities when determining whether their final budgetary appropriations have exceeded the limits imposed by the Cap Law. Second, we must delineate the standards to which

an arbitrator shall adhere when rendering a compulsory award. Finally, we must determine whether the particular award here at issue should be enforced.

Plaintiff New Jersey State Policemen's Benevolent Association, Local 29 (PBA) is the majority representative of the police officers employed by defendant Town of Irvington. In November of 1977, the parties commenced negotiations concerning the terms of a successor contract to replace their soon-to-expire 1977 collective agreement. Negotiations having reached an impasse, on December 28, 1977 the Public Employment Relations Commission (PERC) invoked the compulsory interest arbitration provisions of the Employer-Employee Relations Act, *N. J. S. A.* 34:13A–14 *et seq.,* and appointed an arbitrator to resolve the dispute.

*N. J. S. A.* 34:13A–16 mandates that in the event a municipality and the majority representative of its police employees are unable to reach a voluntary agreement, the matter must be submitted to an arbitrator who will then select the terms that will be incorporated in the parties' collective agreement. The parties are free to select one of a number of types of arbitration in order to resolve their dispute. *See N. J. S. A.* 34:13A–16(c)(1)–(6). In the present case, the parties agreed to submit the matter to "final offer" interest arbitration. *N. J. S. A.* 34:13A–16(c)(6).

Final offer arbitration does not allow the arbitrator to make any award which he feels is most reasonable under the circumstances. Rather, each party puts forth its final offer as to all outstanding economic and non-economic issues. The economic demands are treated as a single package. The arbitrator must choose to incorporate in the collective agreement either the entire package proposed by the employer or that put forth by the employee representative. He cannot render a compromise award. *See N. J. S. A.* 34:13A–16(c)(6).

A similar constraint is placed upon the arbitrator's decision relating to non-economic issues. Unlike the economic pro-

posals, however, non-economic matters are treated separately rather than as a package. As to each such matter, the arbitrator must choose either the final offer put forth by the employer or that proposed by the employee representative. *N. J. S. A.* 34:13A–16(c)(6).

In the present case, the PBA's final economic package consisted of the following: (a) a $1,000 per year salary hike for all police officers effective January 1, 1978; (b) a $100 increase in patrolmen's annual clothing allowances; (c) a credit of one extra day of compensatory time for each officer; (d) one additional paid holiday per year; and (e) an increase of $200 in the annual allowances received by patrolmen assigned to the Detective Bureau. Its non-economic proposals included (a) additional time-off with pay in the event of a death in the family; (b) a clause in the collective agreement specifying the current level of insurance coverage provided by the Town; (c) a grant of two days off per week to the PBA president in order to conduct PBA business; (d) the Town's furnishing of a marked police vehicle for officers wishing to attend the funerals of fellow policemen slain in the line of duty; and (e) a provision that patrolmen be allowed to exchange their tours of duty with other officers should they deem this necessary for "personal reasons."

The Town's final offer consisted of a single economic item — that the salaries of all patrolmen be increased by 5% effective July 1, 1978. (This raise would amount to a $745 per year salary increment for "top step" officers — *i. e.,* those who had served more than three years on the force.) All other proposals put forth by the PBA — whether economic or non-economic — were rejected.

At the hearing before the arbitrator, the vast majority of the evidence tendered related to the reasonableness of the parties' economic packages. The PBA presented exhibits relating to increases in the Consumer Price Index since 1969 in order to demonstrate that past pay hikes granted patrolmen had not kept pace with the rate of inflation. It also attempted to show that the present salary schedule and

clothing allowances of Irvington police officers were low in comparison to the benefits granted patrolmen in other Essex County communities. Finally, the PBA presented data demonstrating that the cost of implementing its economic package — estimated at $177,000 — could be defrayed by the Town without undue difficulty.

The Town contended that due to the Legislature's enactment in 1976 of the so-called Local Government Cap Law, *N. J. S. A.* 40A:4-45.1 *et seq.,* it could not afford to grant patrolmen more than a 5% pay hike effective July 1. In order to comply with the Cap Law, Irvington's total budgetary appropriations in 1978 could not, with certain exceptions, exceed its 1977 overall appropriations by more than 5%. *See N. J. S. A.* 40A:4-45.2. For 1978 budget purposes, this 5% increment amounted to $536,332.

According to Vincent Foti, Irvington's Controller, $525,000 of this $536,332 allowable increment had already been "eaten up" by actions taken by the municipality prior to 1978. In 1977, the Town had agreed to grant each of its 600 employees a $1,750 salary raise effective July 1, 1977. Half of this salary increase — $875 per employee — would be paid in the first six months of 1978 and hence had to be accommodated within the 1978 Cap figure. Foti further testified that the Town's utility and insurance rates had increased substantially in 1978 — increases which also had to be reflected in the final appropriations figure which was subject to the Cap Law's 5% ceiling.

Not wishing to deprive its employees of any raise during the 1978 calendar year, in preparing its 1978 budget the Town drastically reduced its expenditures in many areas. All departmental requests for additional personnel or overtime were eliminated. No new appropriations were made for purchases of equipment, employee training programs, summer employees, street paving, and the maintenance and repair of equipment, parks and municipal buildings. Expenditures for cultural and recreational programs, library upkeep, and public works projects were substantially curtailed.

As a result of these cutbacks, the Town estimated that $285,000 was available to fund salary increases for all of its 600 employees. The Town therefore offered a 5 % across the board pay hike effective July 1. In this way, only half of the 5% increase would have to be accommodated within its 1978 Cap figure. The Municipal Employees Association — the majority representative of the Town's blue and white collar workers — accepted this proposal. The PBA did not.

The Town presented evidence demonstrating that if the PBA's package were accepted, it would be forced to lay off many essential personnel in order to stay within the limits mandated by the Cap Law. These layoffs, according to the Town's witnesses, would lessen the manpower of departments already being run by "skeletal crews" and hence be extremely detrimental to the citizens of Irvington.

Finally, the Town maintained that past salary raises granted its patrolmen had kept pace with the rate of inflation. It also emphasized that salary increases received by police officers had always had an effective date of July 1 rather than January 1, and that during the first six months of 1978, its employees would be receiving, for the first time, $875 of the $1,750 raise implemented on July 1, 1977.

On October 9, 1978, the arbitrator issued his opinion. *See* N. J. S. A. 34:13A–16(f)(5). He estimated that the cost of implementing the Town's proposal would be approximately $46,200 in calendar year 1978, while the cost of the PBA's package would approach $150,000. He then concluded that the PBA's economic proposals were "more fair and reasonable" than those put forth by the Town and ruled that the PBA's package should be incorporated in the parties' 1978 collective agreement. As to the non-economic issues, the arbitrator rejected each of the PBA's demands except that relating to the specification of insurance coverage in the contract.

One week later, on October 16, 1978, the PBA filed a complaint in Superior Court seeking confirmation of the award. *See* N. J. S. A. 34:13A–19. The Town, named as

defendant, moved that the award be vacated on the ground that it was manifestly unreasonable given the evidence that had been adduced at the arbitration hearing. *See N. J. S. A.* 34:13A–16(f)(5); *cf. Division 540 v. Mercer County Improvement Auth., 76 N. J.* 245 (1978). The Town also sought a declaratory judgment that, regardless of the award's validity, the costs incurred in order to implement the arbitrator's decision constituted "[e]xpenditures mandated after the effective date of [the Cap Law] pursuant to State * * * law," *see N. J. S. A.* 40A:4–45.3(g), and hence were not expenditures which need be considered by the municipality in determining whether its 1978 final appropriations exceeded the 5% ceiling established by the Cap Law.

Due to the arbitrator's failure to specify in detail the reasoning underlying the award, the trial judge concluded that he could not meaningfully determine whether the arbitrator had complied with the standards set forth in *N. J. S. A.* 34:13A–16. He therefore remanded the cause to the arbitrator with instructions to more fully explicate the basis of his decision.

Pursuant to the judge's instructions, on December 5, 1978, the arbitrator issued a second opinion. In this opinion he both "reaffirmed" his earlier decision and set forth his reasons for so doing. In his view, the Town's offer of a 5% pay hike effective July 1 — in effect, amounting to only a 2½% salary raise during calendar year 1978 — was "not merely low, it [was] unreasonable" given the rate of inflation, the salaries received by police officers in other Essex County municipalities, and the number of pay hikes that had been accorded Irvington patrolmen in past years. He then noted that the cost of the PBA's economic package would be approximately $150,000 while the increase in final appropriations over the Town's 1977 expenditures allowed by the Cap Law was $536,332 — a substantially higher figure. Although acknowledging that the Town had already drawn up its final budget and that only $46,200 had been appropriated for increased police costs, the arbitrator felt that the Town

could modify its budget or take other measures in order to implement the PBA's economic package without causing undue difficulties to the Town's inhabitants.

On December 28, 1978, the trial judge concluded that the arbitrator's decision was not "arbitrary or capricious" and confirmed the award. The judge also ruled that the costs to be incurred in implementing that award would have to be accommodated within the limits specified by the Cap Law. On January 10, 1979, the Town filed a notice of appeal to the Appellate Division. While the matter was pending unheard before the appellate judges, we directly certified the case to this Court on our own motion.

I

Before addressing the merits of the parties' contentions, it is necessary to sketch briefly both the mechanics and underlying purposes of the Local Government Cap Law, *N. J. S. A.* 40A:4–45.1 *et seq.* In 1976, the State Legislature enacted the New Jersey Gross Income Tax Act, *N. J. S. A.* 54A:1–1 *et seq.*, in order to provide a method for the funding of public schools consistent with this Court's mandate in *Robinson v. Cahill,* 70 *N. J.* 155 (1976). Passage of that law, however, was conditioned upon the enactment of what has popularly been labelled an "income tax package." *See L.* 1976, *c.* 47, § 27(c). Included within this "package" were the State Cap Law, *N. J. S. A.* 52:9H–5 *et seq. (L.* 1976, *c.* 67, amended *L.* 1977, *c.* 22) and the Local Government Cap Law, *N. J. S. A.* 40A:4–45.1 *et seq. (L.* 1976, *c.* 68, amended *L.* 1977, *c.* 10, amended *L.* 1978, *c.* 155) — statutes which limit, respectively, spending by or the tax levies of State, county, and municipal governments. By adopting this package, the Legislature sought to assure the public that the new income tax act would primarily restructure the method of taxation rather than increase dramatically the overall sums that citizens would have to expend in order to finance the workings of government. *See N. J. S. A.*

40A:4–45.1; *New Jersey State Policemen's Benevolent Ass'n, Local 16 v. City of East Orange,* 164 *N. J. Super.* 436, 449 (Ch. Div. 1978).

In enacting the Local Government Cap Law, the Legislature declared it to be

the policy of the [State] that the spiraling costs of local government must be controlled to protect the homeowners of the State and enable them to maintain their homesteads.

[*N. J. S. A.* 40A:4–45.1]

The Legislature also recognized, however, that

local government cannot be constrained to the point that it is impossible to provide necessary services to its residents.

[*Id.*]

Accordingly, it ordained that, subject to certain exceptions, beginning with the 1977 tax year, municipalities having a municipal purposes tax levy in excess of $0.10 per $100 "shall be prohibited from increasing their final appropriations by more than 5% over the previous year * * *." *N. J. S. A.* 40A:4–45.2. In this way the Legislature attempted to insure that local real estate taxes would not be unduly increased, particularly those levied against individual homeowners. *See N. J. S. A.* 40A:4–45.1; *New Jersey State Policemen's Benevolent Ass'n, supra,* 164 *N. J. Super.* at 449. As originally enacted, the law was to expire on December 31, 1979. *L.* 1976, *c.* 68, § 7. It has since been amended to provide for a termination date of December 31, 1982. *L.* 1978, *c.* 155, § 1.

■ As the wording of the statute makes clear, it is the final line of appropriations in a municipal budget (less expenditures excepted from Cap consideration) which cannot exceed by more than 5% the previous year's overall appropriations diminished by that year's Cap exclusions. The law does not preclude a municipality from increasing in excess of 5% any particular line item or items which are re-

flected in the town's total appropriations. It is the budget as a whole, rather than each component thereof, which is subject to the 5% ceiling. *See Clark v. Degnan,* 163 *N. J. Super.* 344, 359 (Law Div. 1978) (appeal pending); Attorney General's Formal Opinion No. 3 (1977) at 4–5.

Certain expenditures are excluded from consideration in determining whether a municipality's final appropriations fall within permissible Cap Law limitations. *See N. J. S. A.* 40A:4–45.3(a) – (j). Among these exclusions are "[e]xpenditures mandated after the effective date of [the Cap Law] pursuant to State or Federal law." *N. J. S. A.* 40A:4–45.3,(g). In the present case, both the PBA and the Town contend that arbitration awards which derive from compulsory interest arbitration, *see N. J. S. A.* 34:13A–14 *et seq.,* are encompassed within this Cap Law exception. Consequently, they maintain that the Town can disregard the costs to be incurred in implementing the award here at issue when determining whether its 1978 final appropriations have run afoul of *N. J. S. A.* 40A:4–45.2.

Recorded legislative history fails to clearly illuminate the precise types of municipal appropriations sought to be encompassed within the phrase "[e]xpenditures mandated after the effective date of this act pursuant to State or Federal law." As originally worded, Assembly Bill No. 1738 — the Bill from which the Local Government Cap Law is derived — contained only three exceptions, not including the one here at issue. The Cap exclusion ultimately codified as *N. J. S. A.* 40A:4–45.3(g) was one of several exclusions added to the Bill without comment on March 10, 1976 by the Assembly Committee on Taxation. The statement of the Senate Revenue, Finance and Appropriations Committee accompanying the legislation merely notes that the exception refers to "[s]pecific types of expenditures, such as State mandated programs * * *."

In light of the paucity of legislative history dealing explicitly with *N. J. S. A.* 40A:4–45.3(g), its meaning must be discerned by reference to the overall purposes sought

to be furthered by the entire legislative scheme. *See, e. g., New Jersey Builders, Owners, and Managers Ass'n v. Blair,* 60 *N. J.* 330 (1972); *Union County Bd. of Chosen Freeholders v. Union Cty. Park Comm'n,* 41 *N. J.* 333, 341 (1964); *Watt v. Franklin Borough,* 21 *N. J.* 274, 277–278 (1956). The Legislature is presumed to have acted reasonably. Consequently, we must construe *N. J. S. A.* 40A:4–45.3.(g) so that it is consistent with the statute's primary intent. *See, e. g., Roman v. Sharper,* 53 *N. J.* 338, 341 (1969); *Restaurant Enterprises, Inc. v. Sussex Mutual Ins. Co.,* 52 *N. J.* 73, 77 (1968); *Marranca v. Harbo,* 41 *N. J.* 569, 574 (1964); *Schierstead v. Brigantine,* 29 *N. J.* 220, 231 (1959).

██ The Local Government Cap Law seeks to achieve two ends: (1) containment of the spiraling costs of local government, and (2) avoidance of the imposition of such severe fiscal restraints upon municipalities that residents will be deprived of necessary services. See *supra* at 281. As a practical matter, the latter goal would generally be frustrated were a township required to include in its final appropriations figure expenditures for all new services or activities undertaken for the first time subsequent to the Cap Law's effective date. Absent exclusion from the Cap, these "new" expenditures might consume the whole of or more than the allowable yearly increment in a municipality's budget, and thereby compel cutbacks in other areas in order that financing be available for activities not funded in previous budgets. In our view, *N. J. S. A.* 40A:4–45.3(g) was enacted in order to prevent the occurrence of such a state of affairs.

Not all "new" expenditures, however, fall within the exception's ambit. Rather, *N. J. S. A.* 40A:4–45.3(g) merely excludes "[e]xpenditures mandated * * * pursuant to State or Federal law." The Legislature thus intended to except from Cap consideration only "new" expenditures which local authorities had no discretion to limit.

The question which remains is whether costs incurred in implementing compulsory arbitration awards are among the types of costs which are encompassed by this exception. For

the reasons to be given below, we have concluded that they are not.

## II

■ "Interest" arbitration — the type of arbitration in which the present parties participated — involves the submission of a dispute concerning the terms of a new contract to an arbitrator, who selects those terms and thus in effect writes the parties' collective agreement. *See Division 540, Amalgamated Transit Union v. Mercer County Improvement Auth.,* 76 *N. J.* 245, 249 (1978). It is to be distinguished from "grievance" arbitration, which is a method of resolving differences concerning the interpretation, application, or violation of an already existing contract. *See State v. State Supervisory Employees Ass'n,* 78 *N. J.* 54 (1978); *Township of West Windsor v. PERC,* 78 *N. J.* 98 (1978).

As early as 1941, the Legislature recognized the right of public employers and employees to resolve negotiation impasses through binding arbitration. *See L.* 1941, *c.* 100 (now codified as *N. J. S. A.* 34:13A–7). Arbitral submission, however, was entirely dependent upon the "agreement of the parties." *Id.* Thus, the consent of both the employer and the employee representative was a prerequisite to arbitration.

This remained the state of the law for approximately 25 years. In 1974, however, the Legislature created a study commission, one of whose main tasks was that of devising a method by which public sector negotiating impasses could be quickly, fairly, and effectively resolved. *L.* 1974, *c.* 124. The study commission's final report, issued in 1976, recommended that such impasses be settled through resort to compulsory interest arbitration. *See* Public Employer-Employee Relations Study Commission, *Report to the Governor and the Legislature* (1976). *See generally,* Tener, "The Public Employment Relations Commission: The First Decade," 9 *Rutgers-Camden L. J.* 609, 618–623 (1978).

This report influenced the passage in 1977 of certain amendments to the Employer-Employee Relations Act, *N. J. S. A.* 34:13A–1 *et seq.* In what is commonly referred to as "Chapter 85," the Legislature provided for compulsory interest arbitration in the event that a public employer and the majority representative of either its police or firefighting employees reached an impasse in negotiations and the parties could not voluntarily agree upon a method of resolving their differences. *L.* 1977, *c.* 85 (codified at *N. J. S. A.* 34:13A–14 *et ·seq.*) The reasons underlying the enactment of Chapter 85 were stated in its opening section:

[I]n public fire and police departments, where public employees do not enjoy the right to strike, it is requisite to the high morale of such employees and the efficient operation of such departments to afford an alternate, expeditious, effective and binding procedure for the resolution of disputes * * *.

[*L.* 1977, *c.* 85, § 1 (codified at *N. J. S. A.* 34:13A–14)]

Although mandating arbitral submission in certain circumstances, Chapter 85 was not intended to, nor does it, discourage public employers and their police and firefighting employees from voluntarily resolving their differences. Indeed, its provisions do not become operative unless and until negotiations have reached an impasse — *i. e.,* until the parties have arrived at a juncture where neither will compromise its demands and no method of breaking the stalemate is mutually agreeable. *N. J. S. A.* 34:13A–16(a). Even at this stage, however, binding arbitration is not mandated. Rather, PERC is encouraged to "take such steps including the assignment of a mediator * * * [in order] to effect a *voluntary* resolution of the impasse." *Id.* (emphasis supplied). If the impasse continues, at the request of either party PERC must "invoke factfinding with recommendation for settlement of all issues in dispute * * *." *N. J. S. A.* 34:13A–16(b). Neither party, however, is bound by the recommendation.

Only if a voluntary settlement has not been achieved as of 60 days prior to the municipality's budget submission date

do the "compulsory" provisions of Chapter 85 come into play. The parties are required to notify PERC whether they have mutually consented to an allowable "terminal procedure" through which their differences can be resolved. *N. J. S. A.* 34:13A–16(b). The statute lists six such procedures, but also provides for the utilization of any other dispute-settling mechanism if "approved" by PERC. *N. J. S. A.* 34:13A–16(b), (c)(1)–(6). If as of 50 days prior to budget submission date an allowable terminal procedure cannot be mutually agreed to, the parties must submit their dispute to binding "final offer" interest arbitration. *N. J. S. A.* 34:13A–16.(d). However, even after the commencement of formal arbitration proceedings, the arbitrator is encouraged to "assist the parties in reaching a *mutually agreeable* settlement." *N. J. S. A.* 34:13A–16(f)(3) (emphasis supplied).

Compulsory arbitration was thus intended to constitute a "last resort" measure for the resolution of impasses involving public employers and their police or firefighting employees — deadlocks which, if not quickly settled, might cripple a municipality's ability to adequately protect its residents. Chapter 85 seeks to further, not to undermine, the basic policy upon which the entire Employer-Employee Relations Act is bottomed — *i.e.,* that the *"voluntary* [resolution] of * * * disputes * * * will [best] tend to promote permanent, public and private employer-employee peace and the health, welfare, comfort and safety of the people of the State." *N. J. S. A.* 34:13A–2 (emphasis supplied). Indeed, this is likely the reason why the study commission recommended that deadlocks be submitted to "final offer" arbitration. Commentators have generally agreed that this particular form of arbitration encourages voluntary settlements by forcing the parties to tailor their proposals with an eye to the arbitrator's selection of the more reasonable submission. *See* Tener, *supra,* 9 *Rutgers-Camden L. J.* at 622; Bierman, "Fact Finding: Finding the Public Interest." 9 *Rutgers-Camden L. J.* 667, 679–680 (1978); Anderson, MacDonald & O'Reilly, "Impasse Resolution in Public Sector

Collective Bargaining — An Examination of Compulsory Interest Arbitration in New York," 51 *St. John's L. Rev.* 453, 472 (1977); Clemow & Mooney, "Impasse Resolution in Local Government Labor Relations: The Connecticut Approach," 9 *Conn. L. Rev.* 579, 603–604 (1977).

In resolving disputes which the parties have been compelled to submit, the arbitrator must, *inter alia,* "giv[e] due weight" to eight specific factors: (1) the interests and welfare of the public; (2) the conditions of employment of comparable employees; (3) the overall level of benefits presently received by the police or firefighting employees participating in the arbitration proceeding; (4) the stipulations of the parties; (5) the "lawful authority of the employer"; (6) the financial impact of a particular award upon the municipality, its residents, and its taxpayers; (7) the cost of living; and (8) the "continuity and stability of employment." *N. J. S. A.* 34:13A–16.(g)(1)-(8). The arbitrator's award must be accompanied by a written opinion. *N. J. S. A.* 34:13A–16(f) (5). Proceedings to enforce the award may be brought by either party in the Superior Court. *N. J. S. A.* 34:13A–19.

Chapter 85 was signed into law by Governor Byrne on May 10, 1977 — more than eight months subsequent to the effective date of the Local Government Cap Law. Both the Town and the PBA maintain that its passage obligated municipalities to provide a "new service" which had not been funded in pre-1977 budgets — *i. e.,* "the prevention of work stoppages and strikes affecting police and fire protection through compulsory resolution of disputes concerning the terms and conditions of employment." The parties further contend that this "new service" requires the expenditure of increased sums of money. Prior to Chapter 85's enactment, they argue, public employers were never obligated to raise the salaries of their police or firefighting employees, inasmuch as they remained free to refuse to submit negotiation impasses to arbitration. By virtue of *N. J. S. A.* 34:13A–14 *et seq.,* however, an arbitrator now has the authority to order such raises. Consequently, they conclude that costs incurred in

order to implement compulsory arbitration awards constitute "[e]xpenditures mandated after the effective date of [the Cap Law] pursuant to State * * * law." *N. J. S. A.* 40A:4-45.3 (g).

■ Having carefully considered the matter, we have concluded that the parties' contentions in this regard are unpersuasive. Chapter 85 does not require municipalities to provide a new service or engage in a new activity, the costs of which were not reflected in pre-1977 budgets. Rather, its provisions merely establish a mechanism for the resolution of disputes concerning the level of benefits which must be provided for services that were funded long before the Local Government Cap Law came into existence. Municipal appropriations for the financing of police and firefighting activities have been authorized by the Legislature at least as far back as 1917. *See L.* 1917, *c.* 152. Neither party disputes that such appropriations have been reflected in Irvington's budget for decades. The arbitrator's award merely sets the terms and conditions of employment for officers engaging in the same functions that were engaged in by their predecessors before the passage of the Cap Law.

Chapter 85 did not create the "prevention of strikes and work stoppages" as a new service to be financed in post-1977 municipal budgets. Irrespective of that statute's enactment, public employees have never possessed a right, constitutional or otherwise, to strike or engage in work stoppages. *See, e. g., Union Beach Bd. of Ed. v. New Jersey Ed. Ass'n,* 53 *N. J.* 29 (1968); *In re Buehrer,* 50 *N. J.* 501 (1967); *In re Block,* 50 *N. J.* 494 (1967). Indeed, the Legislature explicitly recognized this state of affairs in the opening section of Chapter 85. *L.* 1977, *c.* 85, § 1 (codified at *N. J. S. A.* 34:13A-14).

Moreover, the compulsory arbitration award which is here challenged will not necessarily require the Town to increase its overall amount of police "expenditures." Regardless of the award's validity, Irvington retains the discretion to diminish the size of its police force and limit the areas

in which patrolmen will be deployed, inasmuch as these decisions "unquestionably [are] predominantly managerial function[s]" which cannot be delegated to an arbitrator not accountable to the public at large. *State v. State Supervisory Employees Ass'n, supra,* 78 *N. J.* at 88. The arbitrator's decision merely sets the terms and conditions of employment for those patrolmen whom the municipality desires to hire or retain on its force. As such, the amount of "expenditures" which must be incurred to implement the award are within the township's control.

The arbitral award here at issue thus does not fall within the ambit of *N. J. S. A.* 40A:4-45.3 (g). In our view, any other conclusion would severely undermine the goals sought to be furthered by both the Local Government Cap Law and the Employer-Employee Relations Act. Local government is primarily a service industry, employee compensation constituting a high proportion of its costs. Professor Summers has estimated that payroll expenditures in most American cities comprise from 60 to 70 percent of total operating budgets. *See* Summers, "Public Employee Bargaining: A Political Perspective," 83 *Yale L. J.* 1156, 1165 (1974). According to the *amicus curiae* brief filed in this case on behalf of the New Jersey League of Municipalities, appropriations for the operation of police and fire departments alone "range from 25 to over 50% of the total municipal operating budgets." Indeed, Irvington itself concedes that salaries and fringe benefits account for 75% of its overall budgetary appropriations.

The primary purpose of the Cap Law is to contain the costs of local government. We cannot believe that the Legislature intended to except from the Cap limits increases in expenditures necessary to finance such a huge chunk of a municipality's budget — whether those increases ultimately derived from mutual agreement, voluntary arbitration, or compulsory arbitration. Such an exception would effectively render meaningless the 5% ceiling on municipal appropriations. At the least, we feel that had the Legislature

intended to exclude these costs from Cap consideration, it would have so indicated in clear and unequivocal language. *See New Jersey State Policemen's Benevolent Ass'n, Local 10, supra,* 164 *N. J. Super.* at 450.

Acceptance of the parties' construction of *N. J. S. A.* 40A: 4–45.3.(g) would also frustrate the policies underlying the passage of the Employer-Employee Relations Act. As discussed earlier, both the Act as a whole and its compulsory arbitration sections seek to encourage the parties to a labor dispute to reach mutually agreeable solutions to their differences. Neither party denies that had the Town and the PBA voluntarily settled their negotiation impasse the costs incurred to fund that settlement would be included in the budgetary appropriations subject to the Cap Law's 5% ceiling. A holding that compulsory arbitration awards were not within the cap limits would therefore provide the parties with an incentive *not* to voluntarily resolve their problems. *See New Jersey State Policemen's Benevolent Ass'n, Local 16, supra,* 164 *N. J. Super.* at 450.

Finally, the legislative history dealing with Senate Bill No. 482 — the Bill from which Chapter 85 derives — supports the conclusion that compulsory arbitration awards were intended to fall within the Cap. S–482 was originally introduced in the 1976 legislative session — prior to the release of the final Report of the study commission created to devise methods of fairly and expeditiously resolving public sector negotiating impasses. As originally worded, the Bill provided for conventional arbitration of police and firefighter labor disputes. On July 2, 1976, the Senate amended the Bill so that it would contain a specific reference to the soon-to-be enacted Cap Law:

The arbitrator shall not issue any finding, opinion, or order which shall impose any fiscal obligation on any municipality, county, fire district, or the State * * * which shall cause, by itself or in conjunction with decisions of other arbitrators, any such governmental unit to exceed the limits of any law which imposes spending or budgetary restrictions on any such governmental unit.

By the time the Bill reached the Assembly, however, the study commission had issued its final Report. *See* Public Employer-Employee Relations Study Commission, *Report to the Governor and the Legislature* (1976). The Assembly therefore "rewrote" the Bill so as to include almost verbatim the impasse mechanisms recommended by the Commission, including both the provision for "final offer" arbitration and the enumeration of the eight factors which must be considered by the arbitrator en route to his decision, *see N. J. S. A.* 34:13A–16(g)(1)–(8); *Report* at 33–40. *See generally,* Tener, *supra,* 9 *Rutgers-Camden L. J.* at 619–621. In so doing, the Assembly deleted the factors set forth in the Senate version of the Bill, including the specific Cap Law reference.

This deletion, however, was not intended to exclude arbitral awards from Cap consideration. Scrutiny of the Commission's *Report* shows unmistakably that the Commissioners were mindful of possible budgetary constraints upon local governments. *See Report* at 23–24. Indeed, it appears that three of the eight "factors" for arbitral consideration contained in the *Report* (and ultimately enacted into law) — "[t]he interests and welfare of the public"; "[t]he lawful authority of the employer"; and "[t]he financial impact [of an award] on the governing unit, its residents and taxpayers," *see N. J. S. A.* 34:13A–16(g)(1), (5), (6) — were so phrased as to insure that budgetary constraints were "giv[en] due weight" prior to the rendition of an award. This was the understanding of Albert Burstein, an assemblyman who was both a member of the study commission and the sponsor of the Assembly amendments to S–482. Shortly after the enactment of Chapter 85, Mr. Burstein testified as follows before the Assembly Labor Committee:

[Chapter 85] does require that the arbitrator take into consideration existing law. Now, existing law, among other things, would have to take in view the cap system that we now impose upon budgetary increases amongst municipalities and counties, and the State as well. So those cap increases become something that represents a governor,

as it were, a restriction, over the kind of award that can be rendered.

\* \* \* \* \* \* \* \*

The cap laws have put a new element into this whole picture that makes the work of the arbitrator, I would say, even more difficult that it would have been before because he now has to take into consideration not only the dispute that is before him, but what the requirements of the governing body, whatever it may be — a board of education, a municipality, a county — are in other aspects of governance, what other employees have to get, what the increases in insurance, utilities and all the other things that go into making up a budget represent. So he does have to take that into consideration. It becomes a more complicated process.

> [Hearings Before the Assembly
> Labor Committee (1977) at 3, 4]

Clearly, the Legislature would not have required arbitrators to "giv[e] due weight" to Cap constraints if it believed that the costs to be incurred in implementing their awards were excepted from Cap limitations.[1]

## III

The final question presented for review is whether the particular arbitration award here at issue should be enforced.

---

[1] The Attorney General takes the position that *N. J. S. A.* 40A: 4–45.3(g) excludes from a municipality's Cap determinations only "expenditures for *programs* required by newly enacted *legislation* \* \* \*" Attorney General Formal Opinion No. 3, 1977 at 10 (emphasis supplied). In light of both the purposes underlying its enactment as well as the statement of the Senate Committee accompanying its passage, see *ante* at 282, there can be no question but that at a minimum *N. J. S. A.* 40A:4–45.3(g) encompasses such expenditures. The one lower court to consider the issue, however, has ruled that the exception pertains to more than this "minimum." *See Clark v. Degnan, supra,* 163 *N. J. Super.* at 370–374 (appeal pending).

In view of the limited holding which we have today reached, we perceive no necessity to delineate the full parameters of *N. J. S. A.* 40A:4–45.3(g). The briefs and oral arguments in this case have been confined solely to the issue of whether compulsory arbitration awards fall within the exception's ambit. Consequently, we express no view as to correctness of the Attorney General's interpretation of *N. J. S. A.* 40A:4–45.3(g) or the construction given that statute by the lower court in *Clark.*

N. J. S. A. 34:13A–16 provides that awards deriving from Chapter 85 compulsory arbitration must be "based on a reasonable determination of the issues" and that such awards may be vacated, *inter alia,* should the arbitrator have failed to "giv[e] due weight" to the eight factors enumerated in N. J. S. A. 34:13A–16(g). These eight factors have been set forth earlier in this opinion, see *supra* at 287, and need not here be repeated. We wish to reemphasize, however, that three of these factors — (1) "[t]he interests and welfare of the public"; (2) "[t]he lawful authority of the employer"; and (3) "[t]he financial impact [of an award] on the governing unit, its residents and taxpayers," *see N. J. S. A.* 34:13A–16(g)(1), (5), (6) — require the arbitrator to consider a municipality's Cap Law constraints prior to the rendition of an award.

Indeed, even absent the express enumeration of these three factors, an arbitrator's consideration of a town's Cap situation is mandated by the constitutional proscription against undue delegations of legislative authority to private individuals. *See Division 540, Amalgamated Transit Union v. Mercer County Improvement Auth.,* 76 N. J. 245 (1978); *cf. Ridgefield Park Ed. Ass'n v. Ridgefield Park Bd. of Ed.,* 78 N. J. 144, 163–165 (1978). In *Division 540,* this Court, speaking through Justice Sullivan, upheld public sector compulsory arbitration as a constitutionally permissible method of averting the detrimental consequences of prolonged labor disputes. We emphasized, however, that the arbitrator in rendering an award must take into account "the public interest and the impact of his decision on the public welfare." 76 N. J. at 252; *cf. Ridgefield Park, supra,* 78 N. J. at 164.

Clearly, an arbitrator would breach this duty were he not to take cognizance of a town's Cap constraints. An exceedingly high award would force a municipality to lay off large numbers of employees or in other ways drastically cut back necessary services — moves which would undoubtedly cause hardships to the town's inhabitants.

*Division 540* also establishes the standard of review to be utilized by our courts when determining the validity of a compulsory award. As Justice Sullivan there explained, "principles of fairness, perhaps even due process" require that

the judicial oversight available [in compulsory arbitration settings] * * * be more extensive than the limited judicial review had under *N. J. S. A.* 2A:24–8 to parties who voluntarily submit their dispute to binding arbitration.

[76 *N. J.* at 253]

Consequently, we ruled that where, as here, the arbitration process is compelled by statute, "judicial review should extend to consideration of whether the award is supported by substantial credible evidence present in the record." *Id.* at 254.

We are satisfied that the factual underpinnings of the arbitration award here at issue are supported by substantial credible evidence. Exhibits presented by both parties demonstrated that from July 1973 through July 1977, the Consumer Price Index had risen by 24.9% while the salaries of Irvington patrolmen had increased by merely 20%. C.P.I. data were the only type of evidence adduced which bore upon inflationary trends. Consequently, the arbitrator's conclusion that pay hikes granted patrolmen during this time frame had been outstripped by the rate of inflation was justified.

Also based upon sufficient credible evidence was the arbitrator's finding that the compensation accorded Irvington policemen was low in comparison to that received by those performing comparable work in other communities. Exhibits presented by the PBA demonstrated that the salaries and other benefits received in 1977 by patrolmen employed in 16 of Essex County's 24 municipalities exceeded those received by members of the Irvington police force. Moreover, of the six Essex County municipalities that had concluded 1978 contract negotiations by the close of the arbitration

hearing, only one had agreed to compensate its patrolmen at a rate lower than that proposed by Irvington.

Finally, the record supports the arbitrator's conclusions that (1) the Town's proposed economic package would cost $46,200 in calendar year 1978; (2) the PBA's package would require approximately $150,000 in expenditures; and (3) the 1978 permissible Cap Law increment in Irvington's final appropriations equaled $536,332.23. Indeed, most of the evidence leading to the computation of these figures was supplied by the Town, and the Town does not allege that the arbitrator's calculations were erroneous.

Our inquiry into the validity of the arbitrator's decision is not, however, at an end. The arbitrator was required by statute to "giv[e] due weight" to each of the eight factors listed in *N. J. S. A.* 34:13A–16(g) and to render an award which was "reasonable" in light of those factors. *N. J. S. A.* 34:13A–16(g). A reading of the arbitrator's opinions and the transcripts of the arbitral hearing shows that he considered each of these factors, including the Town's ability to fund his award given its Cap Law constraints. The Town does not contend otherwise. Rather, the gist of the Town's complaint appears to be that in light of these factors, the award was not reasonable.

We cannot agree. It is true that Town witnesses testified that in 1977 and 1978, Irvington's Cap situation compelled municipal officials to reduce appropriations in many areas below that which was deemed optimal, and that acceptance of the PBA's economic package would result in the layoff of even more police, firefighting and sanitation personnel. No claim was made, however, that the Town was, or would be placed, in such dire straits that residents would be deprived of those services reasonably necessary to the orderly functioning of the community. Moreover, other evidence demonstrated that patrolmen's salaries were low in comparison to those of their peers working in other Essex County communities and that these salaries had increased at a rate less than the rate of inflation.

Given this evidence, we cannot say that the arbitrator's award was unreasonable. And this, despite the fact that all past pay hikes had had an effective date of July 1 and that during the first six months of 1978, patrolmen will be receiving for the first time $875 of the $1,750 raise implemented July 1, 1977. The arbitrator had no discretion to render a compromise award. He had only two choices — .(1) the entire economic package proposed by the Town, or (2) the entire package put forth by the PBA.

■ We realize that the Town will be forced to make economies in order to implement this arbitral award. This alone, however, does not render the award unreasonable. A town's Cap situation must be taken into account by the arbitrator; it is not, however, the only matter which he must consider.

IV

■ The manner in which the Town will comply with the award without running afoul of Cap Law proscriptions is a matter which neither we nor the arbitrator have the authority to decree. The Local Budget Law, *N. J. S. A.* 40A:4–1 *et seq.*, assigns to the local governing body the task of allocating available resources among the various services which it chooses to provide. Municipal officials must determine whether, and to what extent, police personnel or other town employees should be laid off, or whether budgetary appropriations for non-payroll costs should be reduced. The Cap Law has forced them to make hard choices. Such decisions are clearly "inherent management perogatives pertaining to the determination of governmental policy" which cannot be delegated to an arbitrator. *State v. State Supervisory Employees Ass'n, supra,* 78 *N. J.* at 67; *see, e. g., Bernards Tp. Bd. of Ed. v. Bernards Tp. Ed. Ass'n,* 79 *N. J.* 311, 320 (1979); *Ridgefield Park Ed. Ass'n, supra,* 78 *N. J.* at 156.

■ We realize that whatever the methods utilized in order to implement the award, in the end Irvington's residents will bear the brunt of that award in the form of re-

duced municipal services. Although Irvington will be able to provide those services that are reasonably necessary for the functioning of the community, there can be no question but that hardships will ensue. These hardships, however, are insufficient to persuade us that arbitral awards do not fall within the Cap. The language, legislative history, and policies underlying both the Local Government Cap Law and Chapter 85 compel the holdings which we have today rendered. We can only apply the laws that have been enacted by the Legislature; absent constitutional infirmities, we cannot change those laws, regardless of our views as to their desirability.

In a world plagued by double-digit inflation, some group will likely suffer if municipal appropriations can increase each year by at most 5%. Non-payroll costs, such as utilities and insurance, will generally rise by more than 5%. As a result, payroll expenditures must increase by less than 5% if the municipality is to remain within permissible Cap Law limits. If the municipality desires to maintain its current level of services, it will therefore be forced to grant pay raises which are outstripped by the rate of inflation. In such a case, the real income of public employees will diminish with time.

If a municipality does not wish to or, as in the present case, cannot prevent salary levels from rising above a 5% figure, it will be forced to effect further genuine economies and thus cut back the services which it had theretofore provided its residents. In such a case, the burden ensuing from the Cap Law will be borne by those residents as well as by the employees whose jobs are eliminated on account of the town's fiscal situation.

The facts of this case forcefully illustrate these points. Due to 1978 increases in Irvington's utility and insurance rates and the raise granted its employees effective July 1, 1977, severe cutbacks in services were required in order that the Town's budget not exceed Cap Law limits. All departmental requests for additional personnel and overtime were eliminated. No new appropriations were made for purchases of

equipment, employee training programs, summer employees, street paving, and the maintainance and repair of equipment, parks, and municipal buildings. Expenditures for cultural and recreational programs, the upkeep of the Town's library, and public works projects were substantially curtailed. In order to implement the arbitration award which we have today confirmed, Irvington states in its brief that it will be compelled to lay off an additional 23 employees. Whether by attrition or layoff, the municipality's ability to provide municipal services will be eroded.

The Legislature has attempted to avoid the emergence of "crisis" situations by enacting various Cap Law exceptions. *See N. J. S. A.* 40A:4–45.3(a)–(j). Of special note is exception (i), a section which allows a municipality to exceed the 5% Cap Law ceiling if its residents approve of such action by referendum. Also worthy of mention are various provisions allowing a municipality to exceed the Cap if necessary to deal with "emergency" situations. *See N. J. S. A.* 40A:4–45.3(c); 40A:4–46 *et seq.* However, to the extent that aggregate yearly emergency appropriations exceed 3% of the town's current and utility operating appropriations, they must be considered as part of the following year's budget and thus be accommodated within the succeeding year's permissible Cap Law increment. *N. J. S. A.* 40A:4–45.3(c); 40A:4–46; 40A:4–47. *See* Attorney General Formal Opinion No. 3 (1977) at 7–9.

Whether these Cap exceptions are sufficient to enable a municipality to both cope with the 5% ceiling and preserve essential municipal services while limiting tax increases and respecting the rights of public employees is a matter which is not free from doubt. Emergency appropriations in excess of 3% of the town's budget must be accommodated within the succeeding year's Cap. Therefore, *N. J. S. A.* 40A:4–46 *et seq.* will merely operate to postpone, rather than avert, major fiscal crises. Referenda, although constituting a democratic mechanism for resolving budgetary problems, may be

an elusive remedy. We lack sufficient empirical data to pass judgment upon the effectiveness of that approach.

This is not to say that we disapprove of legislative enactments seeking to limit municipal expenditures (thereby stimulating greater efficiency in government) and concomitantly the tax burdens which our citizens must shoulder. Achievement of such goals is to be applauded. Both are desirable ends. While it may well be that Irvington, like many other municipalities, finds itself handcuffed by the limitations imposed on its yearly budget increments, we are powerless to remove those handcuffs. The fiscal constraints to be imposed upon local governments are matters of legislative, not judicial, prerogative.

The judgment of the trial court is affirmed.

*For affirmance*—Justices MOUNTAIN, PASHMAN, CLIFFORD and SCHREIBER and Judge HALPERN—5.

*For reversal*—None.