58 A.3d 1186

IN THE MATTER OF THE CITY OF CAMDEN AND
THE INTERNATIONAL ASSOCIATION OF
FIREFIGHTERS, LOCAL 788.

Superior Court of New Jersey
Appellate Division

Argued December 3, 2012—Decided January 29, 2013.

310

314

Before Judges GRAVES, ESPINOSA and GUADAGNO.

*William M. Tambussi* argued the cause for appellant City of Camden (*Brown & Connery, LLP*, attorneys; *Mr. Tambussi, Michael J. DiPiero* and *Kristin L. Van Arsdale*, on the briefs).

*Raymond G. Heineman* argued the cause for respondent International Association of Firefighters, Local 788 (*Kroll Heineman Carton, LLC*, attorneys; *Mr. Heineman*, on the brief).

*Martin R. Pachman*, General Counsel, argued the cause for respondent The New Jersey Public Employment Relations Commission (*David N. Gambert*, Deputy General Counsel, on the statement in lieu of a brief).

*Sally Ann Fields*, Senior Deputy Attorney General, argued the cause for amicus curiae State of New Jersey (*Jeffrey S. Chiesa*, Attorney General, attorney; *Robert Lougy*, Assistant Attorney General, of counsel; *Ms. Fields*, on the brief).

The opinion of the court was delivered by

ESPINOSA, J.A.D.

For more than a decade, the State of New Jersey has responded to the dire financial circumstances of appellant, City of Camden (the City), by providing "extraordinary payments of State aid[.]" *N.J.S.A.* 52:27BBB–2(i). The amount of State aid has, however, declined in recent years. When the collective bargaining agreement (CBA) between the City and defendant International Association of Fire Fighters, Local 788 (the Union or IAFF) expired on

December 31, 2008, the parties engaged in compulsory interest arbitration pursuant to the Police and Fire Public Interest Arbitration Reform Act (the Compulsory Interest Arbitration Act), *N.J.S.A.* 34:13A–14 to –21.[1] The resulting arbitration award provided for salary increases for the firefighters which, it is undisputed, the City cannot pay from its own tax base. Stated briefly, the arbitrator's means of accommodating that obstacle was to call the State of New Jersey a "fourth party" to the arbitration and conclude that the State is required to pay the shortfall. The City appeals from a final decision of the Public Employee Relations Commission (PERC) that affirmed the award. For the reasons that follow, we reverse PERC's decision to affirm the award, vacate the award and further hold that the matter should proceed before a different arbitrator on remand.

I

In 2005, the City entered into a CBA with IAFF that expired December 31, 2008. When the parties entered into the CBA, the City's fiscal distress was already the subject of legislative action.

Two years earlier, the Legislature enacted the Municipal Rehabilitation and Economic Recovery Act (MRERA), *N.J.S.A.* 52:27BBB–1 to –65, having found that "certain municipalities" were "[e]conomically impoverished," and in a "continuing state of fiscal distress[.]" *N.J.S.A.* 52:27BBB–2(a), (b). The Legislature observed that conditions in "those municipalities ... [have] necessitated the maintenance of large police and fire departments, at enormous taxpayer cost in municipalities without a sound tax base[,]" *N.J.S.A.* 52:27BBB–2(b), and further, that "the ratable base in these municipalities has declined steadily during the 1990's[.]" *N.J.S.A.* 52:27BBB–2(f). As a result, "[t]hese municipalities have experienced a substantial budget deficit for ·many

---

[1] The Act was amended in 2010 to add sections –16.7 to 16.9, effective January 1, 2011.

years which has only been addressed through extraordinary payments of State aid[.]" *N.J.S.A.* 52:27BBB–2(i).

The Legislature declared:

> In light of the dire needs faced by such municipalities and the lack of progress in addressing those needs either governmentally or through private sector initiative, and given the successful interventions on the part of other states in analogous circumstances, it is incumbent upon the State to take exceptional measures, on an interim basis, to rectify certain governance issues faced by such municipalities and to strategically invest those sums of money necessary in order to assure the long-term financial viability of these municipalities.
>
> [*N.J.S.A.* 52:27BBB–2(*o* ).]

To be a qualified municipality under MRERA at the time, "the municipality already [had to] be subject to the supervision of a financial review board and the State Local Finance Board pursuant to other statutory schemes ... [and] the municipality [had to] be relying on state funding for at least fifty-five percent of its 'total budget.'" *Camden City Bd. of Educ. v. McGreevey,* 369 *N.J.Super.* 592, 598, 850 *A.*2d 505 (App.Div.2004) (citing *N.J.S.A.* 52:27BBB–3). As of 2007, Camden was the only municipality in the State in which MRERA had been implemented. *N.J.S.A.* 52:27BBB–2.2(b); *see Senate Community and Urban Affairs Committee, Statement to S.3006* (June 21, 2007).

As part of the implementation of MRERA, the Governor appointed a "chief operating officer" (COO) for Camden for a five-year "rehabilitation term" to reorganize municipal governance and finances in conjunction with the mayor and the municipality's governing body. *N.J.S.A.* 52:27BBB–7 to –30; *McGreevey, supra,* 369 *N.J.Super.* at 597–98, 850 *A.*2d 505. In the fourth year of the rehabilitation term, the COO prepared a report, as required by *N.J.S.A.* 52:27BBB–8(a), in which he recommended an extension of the rehabilitation term. *N.J.S.A.* 52:27BBB–7(c).

The Legislature agreed, finding a ten-year rehabilitation term "more realistic" for the effectuation of necessary government reform. *N.J.S.A.* 52:27BBB–2.2(d). It amended the statute to extend the term of the COO to ten years upon such a recommendation, provided the extension was approved by the Commissioner

of Community Affairs. *N.J.S.A.* 52:27BBB–7(c)(1); *see also* *L.*2007, *c.* 176, § 3, effective September 16, 2007.

Thus, when the CBA expired on December 31, 2008, the City's initial five-year rehabilitation term had been extended to ten years just one year earlier. Negotiations for a successor agreement failed and, in March 2009, the Union filed a petition for interest arbitration pursuant to the Compulsory Interest Arbitration Act.

In April 2009, an interest arbitrator was appointed by PERC.[2] As the arbitrator acknowledged in his subsequent Opinion and Award, he was designated "to render an Award regarding the terms and conditions of a successor Collective Bargaining Agreement . . . after consideration of the statutory criteria of *N.J.S.A.* [3]4:13A–16(g)(1) through (9)."

The arbitrator was also authorized to assist the parties in reaching a settlement through mediation. After his appointment, the parties participated in mediation sessions in 2009. At the parties' first meeting, the Union offered to accept a contract similar to that reached with the City's police officers, which was described as a one-year agreement with a 4% wage increase. The City rejected this offer.

In January 2010, the Legislature amended MRERA to return control of the City to the municipality. *N.J.S.A.* 52:27BBB–6(b)(1)–(8), –27(a), –63(b). Although the mayor assumed the powers of the COO, her authority continued to be limited by MRERA and subject to the veto power of the Commissioner of the Department of Community Affairs. *N.J.S.A.* 52:27BBB–23(a)(2).

The first scheduled evidentiary hearing was conducted on March 9, 2010. The Union submitted eighty exhibits but presented no testimony.

The parties continued efforts to come to an agreement. On May 18, 2010, the City submitted a proposal that called for a three

---

[2] The procedural history in this case is extensive. We summarize those facts relevant to the issues on appeal.

and one-half year term, to end with the fiscal year, in which the employees would receive no raises. In addition, the employees would be required to take one furlough day per month; increase their contributions to health insurance and co-pays; and agree to other provisions. On May 24, 2010, the parties agreed that each would submit an economic proposal to the arbitrator who would then issue a non-binding recommendation for settlement. In the event that either party did not agree with the proposed settlement, the interest arbitration proceeding would resume.

On November 17, 2010, the arbitrator issued a Proposed Settlement of Economic Issues, which included wage increases of 2.5% for calendar year beginning January 1, 2009; 2.0% for calendar year beginning January 1, 2010; 2.0% for calendar year beginning January 1, 2011; and 2.0% for calendar year beginning January 1, 2012. The Union accepted the recommendation but the City rejected the recommendation on the ground that it was unable to fund the proposed settlement.

On January 18, 2011, the City implemented a Layoff Plan it had filed with the Civil Service Commission in November 2010. Among the City employees laid off were a substantial number of police officers and approximately one-third of the firefighters.[3] The Union requested the completion of the arbitration.

The final arbitration hearing was conducted on April 18, 2011.[4] The City presented the testimony of Glynn Jones, the City's Director of Finance, and Michael Nadol, Managing Director of Public Financial Management, a national public financial consulting firm.

Jones testified that for fiscal year 2010, the City's total budget was $185 million, $125 million of which came from State-controlled

---

[3] The bargaining unit consisted of one hundred sixty firefighters.

[4] In the interim, the parties engaged in a mediation session; the City unsuccessfully sought adjournments until it had passed its budget for 2011; and the City presented its Final Proposal on April 12, 2011.

aid. Local taxes levied by the City accounted for $20.6 million of the budget, approximately 89% of which was collected. Jones testified that the City no longer received "special municipal aid or extraordinary aid or capital City aid" from the State. The only State-controlled aid available was "transitional aid," for which the City had to apply each year. Jones stated further that from fiscal year 2010 to fiscal year 2011, the total amount of all forms of aid from the State decreased, and noted a newspaper report that the Governor announced he was reducing the State aid pool from $750 million to approximately $250 million.

Jones also described the difficulty in raising additional revenue by increasing property taxes. He stated the City had no choice regarding an increase. Fifty-two percent of the City's real estate is tax exempt. Even assuming 100% collection, the 3% increase permitted under MRERA would yield less than $700,000, and the City needed to find a way to obtain an exception to the cap. Jones testified that the actual cost of the police and fire pension obligations was $12 million for 2010, $17.7 million for fiscal year 2011, and was projected to be $19.3 million for 2012.

Jones explained how the City's financial problems had led to substantial layoffs of municipal employees, including public safety employees. Describing the pension obligation as "the main problem," Jones said that, as a result of the amount required to be paid, the City submitted an amended aid request and increased its levy "to the max." With personnel costs accounting for "over 70 percent" of the City's budget, Jones said "the only choice [the City] had" was to impose layoffs. Jones testified that over one-third of the City workforce had been laid off, including one hundred sixty-eight police officers and sixty-seven firefighters. The City obtained a one-time $2.5 million grant from South Jersey Port, $500,000 of which was used to return fifteen firefighters to duty for the balance of 2011. The City also obtained a Staffing for Adequate Fire and Emergency Response (SAFER) grant of $5.1 million from the Federal Emergency Management Agency (FEMA), which allowed the City to return sixteen firefighters to

duty. However, a condition of the SAFER grant was that the City maintain the staffing level it had at the time of application. In the event that the City could not maintain that level, FEMA could cut its funding or require the return of funds to them. The City argued that the financial crisis precluded any increase in firefighter compensation and warned that any increase would force additional firefighter layoffs and possibly trigger FEMA sanctions.

On August 14, 2011, the arbitrator issued his Opinion and Award.[5] At the outset, the arbitrator acknowledged the City's "fiscal dilemma" and "the harsh realities of decreased state aid[.]" The arbitrator stated his task was to "objectively balance" that dilemma with "the expectations of its citizens of receiving services and the economic goals of professional fire fighters in maintaining a level of compensation equivalent to their unique, ever-dangerous occupation and service to the City and its residents."

The arbitrator noted that "Camden was (and is) strikingly dependent upon state aid, having received a total of $125,100,682 in state aid for Fiscal Year 2010, including supplemental state aid of $67 million." The City maintained that, despite this aid, it had a deficit for that year of $8 million.

The arbitrator reviewed evidence and acknowledged the parties' arguments pertinent to the nine statutory criteria, *N.J.S.A.* 34:13A–16(g). In his conclusion, he stated,

There is little question that the huge budget deficit and declining state aid forced the City's action in laying off approximately one-third of its Fire Fighters... But, in leaving the Fire Department with a reduced workforce, the City is, by sheer numbers, less capable of performing firefighting duties and, consequently, less capable of providing the protection of its citizens and structures.

The arbitrator stated his "intention was to recognize the importance of the service provided the City by its Fire Fighters through a minimal wage increase within a reasonable, yet confined, financial boundary." The arbitrator described the evidence regarding

---

[5] Although the Opinion and Award were issued after the amendment of the Compulsory Interest Arbitration Act, the mediation and arbitration hearings were conducted prior to the effective date of the amendment.

the City's financial straits as "both informative and reliable." He cited the good faith efforts of the City to meet the fiscal demands, but considered it futile to impose concessions upon the Union:

> [E]ven if this Arbitrator were to consider "freezes" in wages (or zero increases), together with deep reductions in previously negotiated contractual benefits, would the City of Camden be in a stable budgetary position or, more relevant to this interest arbitration, would the City find financial stability if granted nearly 20% reductions or concessions in the Firefighters salary budget? With extensive experience in interest arbitration and the ability to review a record, this Arbitrator is not convinced that any level of concessions by the Firefighters or an award by this Arbitrator would place the City of Camden in a stable budgetary position.

The arbitrator reached beyond the parties to include a "fourth party" that, he stated, "controls the fiscal condition" of the City:

> [D]espite the efforts of the City Administration, the IAFF and the residents of Camden, there is a fourth party [6] to this arbitration which, in reality, controls the fiscal condition of this City. It is the State of New Jersey (for purposes of reference herein, Governor Chris Christie and the State Legislature) which funds the budget shortfall and controls the ultimate amount of money to aid the City and grant Camden its operational ability. And irrespective of the level of success in progressing toward economic stability or independence, it is the final decision of the State of New Jersey, achieved through the State budget process ... and aid programs administered primarily through the Commissioner of the Department of Community Affairs, which permits the City to operate. As such, *the State of New Jersey is the fourth party to this Interest Arbitration.*
>
> [ (Emphasis added).]

"[S]tressing [that] the interests and welfare of the public are best served through a well-trained and effective Fire Department," the arbitrator granted increases to base wages in the award that totaled 8.5% over four years. However, the arbitrator harbored no illusion that the City had the ability to pay the increases awarded:

> To alleviate any misunderstanding or confusion, this Arbitrator does not contend that these increases fit within the City's ability to pay from its present tax base nor could be funded by greater bargaining unit concessions. Indeed, the City, alone, does not have sufficient funds to meet the modest, but reasonable, increases granted. But, when the record was finalized and the evidence reviewed, this Arbitrator reached three clear and realistic conclusions: 1) The City must continue an appropriate level of fire services, irrespective of budgetary shortages, in order

---

6 The Arbitrator had previously referred to the "citizens of Camden" as a "third party" to the proceeding.

to protect the City of Camden, its residents and property; 2) Fire Fighters should be granted reasonable increases in base wages, together with the obligation of paying for a portion of their health care coverage, as their responsibilities continue to grow and their duties expand; and, *perhaps most important, 3) The State must affirmatively provide for the City of Camden what the City cannot provide for itself.*

Herein, when faced with the extreme State mandates and reductions in aid, the City Administration, however well-intentioned in its far-reaching pursuit of 20%-plus reduction in the municipal budget, will struggle to provide the level of fire protection for persons and property within Camden. *In the opinion of this Arbitrator, the State cannot deny addition[al] aid or refuse to fund, either on reasoned basis or moral grounds, the City's Fire Department budget, whether for its operation or for modest Fire Fighter salary increases.* Politic expediency, personal sentiment and current public opinion aside, the State cannot abandon a citizenry that faces the enormity of protecting its city while engaged in budgetary challenges. The breadth of evidence produced in hearing convinced this Arbitrator that *the State of New Jersey must continue as a party to this process* (along with the City, the IAFF and the residents of Camden) to maintain the safety and welfare of the citizens of Camden.

[ (Emphasis added).]

The City appealed the arbitrator's award to PERC, asking that the award be vacated and the matter remanded to a different arbitrator. A draft opinion was prepared that would have granted the relief sought by the City. The opinion failed to win approval by a majority of the Board and, thereafter, the Commission adopted an opinion that affirmed the arbitration award.

In this appeal, the City argues that PERC's decision must be reversed because it is arbitrary and capricious for the following reasons: it violates the statutory mission of *N.J.S.A.* 34:13A-16(g); it is predicated on unsupported findings and violates the standards in *N.J.S.A.* 2A:24-8; and the arbitrator failed to consider evidence which was material to the controversy. In addition, the City argues that the matter must be remanded to a new arbitrator.

II

We begin by reviewing the legal principles applicable to this appeal.

■ Labor negotiations between the City and the Union are governed by *N.J.S.A.* 34:13A-16(a)(1). When the parties are

unable to negotiate a new agreement, they may seek mediation or, as the Union did here, file a petition with PERC for "compulsory interest arbitration." *Hillsdale PBA Local 207 v. Borough of Hillsdale,* 137 *N.J.* 71, 80, 644 *A.*2d 564 (1994); *see N.J.S.A.* 34:13A–16(b)(2). Such arbitration "involves the submission of a dispute concerning the terms of a new contract to an arbitrator, who selects those terms and thus in effect writes the parties' collective agreement." *N.J. State Policemen's Benevolent Ass'n v. Irvington,* 80 *N.J.* 271, 284, 403 *A.*2d 473 (1979) (citing *Div. 540, Amalgamated Transit Union v. Mercer Cnty. Improvement Auth.,* 76 *N.J.* 245, 249, 386 *A.*2d 1290 (1978)). This differs from "grievance arbitration," in which "differences concerning the interpretation, application, or violation of an already existing contract" are submitted to an arbitrator. *Ibid.; see also In re Camden Cnty. Prosecutor,* 394 *N.J.Super.* 15, 18–19, 925 *A.*2d 63 (App.Div. 2007); *S. Plainfield Bd. of Educ. v. S. Plainfield Educ. Ass'n ex rel. English,* 320 *N.J.Super.* 281, 288–89, 727 *A.*2d 71 (App.Div.), *certif. denied,* 161 *N.J.* 332, 736 *A.*2d 525 (1999).

In declaring the public policy underlying the Compulsory Interest Arbitration Act, the Legislature stated, "the best interests of the people of the State are served by the prevention or prompt settlement of labor disputes, both in the private and public sectors[,]" *N.J.S.A.* 34:13A–2, a policy consistent with the favor given to the arbitration of labor-management disputes generally. *See Middletown Twp. PBA Local 124 v. Twp. of Middletown,* 193 *N.J.* 1, 10, 935 *A.*2d 516 (2007); *Scotch Plains–Fanwood Bd. of Educ. v. Scotch Plains–Fanwood Educ. Ass'n,* 139 *N.J.* 141, 149, 651 *A.*2d 1018 (1995). There is a corresponding "strong preference for judicial confirmation of arbitration awards[,]" *Middletown Twp., supra,* 193 *N.J.* at 10, 935 *A.*2d 516, designed to ensure "finality, as well as to secure arbitration's speedy and inexpensive nature[.]" *Ibid.* (quoting *N.J. Tpk. Auth. v. Local 196,* 190 *N.J.* 283, 292, 920 *A.*2d 88 (2007)).

The New Jersey Arbitration Act, *N.J.S.A.* 2A:24–1 to –11, which is applicable to arbitration generally, establishes four circumstances under which a court may vacate an arbitration award:

a. Where the award was procured by corruption, fraud or undue means;

b. Where there was either evident partiality or corruption in the arbitrators, or any thereof;

c. Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause being shown therefor, or in refusing to hear evidence, pertinent and material to the controversy, or of any other misbehaviors prejudicial to the rights of any party;

d. Where the arbitrators exceeded or so imperfectly executed their powers that a mutual, final and definite award upon the subject matter submitted was not made.

[*N.J.S.A.* 2A:24–8.]

Arbitration conducted pursuant to the Compulsory Interest Arbitration Act is further subject to a statutorily mandated procedure, which requires the arbitrator to "decide the dispute based on a reasonable determination of the issues, giving due weight to [enumerated statutory factors] that are judged relevant for the resolution of the specific dispute." *N.J.S.A.* 34:13A–16(g). The factors to be considered are:

(1) The interests and welfare of the public. Among the items the arbitrator or panel of arbitrators shall assess when considering this factor are the limitations imposed upon the employer by P.L.1976, c. 68 (C.40A:4–45.1 et seq.).

(2) Comparison of the wages, salaries, hours, and conditions of employment of the employees involved in the arbitration proceedings with the wages, hours, and conditions of employment of other employees performing the same or similar services and with other employees generally:

(a) In private employment in general; provided, however, each party shall have the right to submit additional evidence for the arbitrator's consideration.

(b) In public employment in general; provided, however, each party shall have the right to submit additional evidence for the arbitrator's consideration.

(c) In public employment in the same or similar comparable jurisdictions, as determined in accordance with section 5 of P.L.1995, c. 425 (C.34:13A–16.2); provided, however, that each party shall have the right to submit additional evidence concerning the comparability of jurisdictions for the arbitrator's consideration.

(3) The overall compensation presently received by the employees, inclusive of direct wages, salary, vacations, holidays, excused leaves, insurance and pensions, medical and hospitalization benefits, and all other economic benefits received.

(4) Stipulations of the parties.

(5) The lawful authority of the employer. Among the items the arbitrator or panel of arbitrators shall assess when considering this factor are the limitations imposed upon the employer by P.L.1976, c. 68 (C.40A:4–45.1 et seq.).

(6) The financial impact on the governing unit, its residents, the limitations imposed upon the local unit's property tax levy pursuant to section 10 of P.L.2007, c. 62 (C.40A:4–45.45), and taxpayers....

(7) The cost of living.

(8) The continuity and stability of employment including seniority rights and such other factors not confined to the foregoing which are ordinarily or traditionally considered in the determination of wages, hours, and conditions of employment through collective negotiations and collective bargaining between the parties in the public service and in private employment.

(9) Statutory restrictions imposed on the employer. Among the items the arbitrator or panel of arbitrators shall assess when considering this factor are the limitations imposed upon the employer by section 10 of P.L.2007, c. 62 (C.40A:4–45.45).

[*N.J.S.A.* 34:13A–16(g).]

In resolving disputes under the Compulsory Interest Arbitration Act, the arbitrator must give "due weight" to these statutory criteria. *Irvington, supra,* 80 *N.J.* at 287, 403 *A.*2d 473. The arbitrator must "indicate which of the factors are deemed relevant, satisfactorily explain why the others are not relevant, and provide an analysis of the evidence on each relevant factor[.]" *N.J.S.A.* 34:13A–16(g). The arbitrator need not rely on all factors, but must identify and weigh the relevant factors and explain why the remaining factors are irrelevant. *Hillsdale, supra,* 137 *N.J.* at 83–84, 644 *A.*2d 564. The resulting "reasoned explanation" serves to satisfy the requirement that the decision be based on the statutory factors that are judged to be relevant and reflect the fact that the arbitrator gave "due weight" to each factor. *Ibid.* "Without such an explanation, the opinion and award may not be a 'reasonable determination of the issues.' " *Id.* at 83, 644 *A.*2d 564 (quoting *N.J.A.C.* 19:16–5.9(b)). The requirement that such an explanation be included in the arbitrator's decision was codified in the amendment to *N.J.S.A.* 34:13A–16 that became effective in January 2011. As amended, *N.J.S.A.* 34:13A–16(f)(5) states, "[e]ach arbitrator's decision *shall* be accompanied by a written report explaining how each of the statutory criteria played into the arbitrator's determination of the final award." (Emphasis added.)

No one factor is dispositive. *Hillsdale, supra,* 137 *N.J.* at 83–84, 644 *A.*2d 564. Yet, the factors themselves reflect the

significance of fiscal considerations. In *Irvington, supra,* 80 *N.J.* at 291, 403 *A.*2d 473, the Supreme Court observed that three of the statutory factors, (1) the "interests and welfare of the public"; (5) the "lawful authority of the employer"; and (6) the "financial impact [of an award] on the governing unit, its residents, . . . and taxpayers[,]" *N.J.S.A.* 34:13A–16(g), "were so phrased as to insure that budgetary constraints were 'giv[en] due weight' prior to the rendition of an award." As to factor (6), the financial impact of the award, the statute imposes specific requirements on both the parties and the arbitrator, stating,

[I]n every interest arbitration proceeding, the parties shall introduce evidence regarding the factor set forth in paragraph (6) of this subsection and the arbitrator shall analyze and consider the factors set forth in paragraph (6) of this subsection in any award[.]

[*N.J.S.A.* 34:13A–16(g).]

The statute also instructs the arbitrator as to the analysis required:

When considering this factor in a dispute in which the public employer is a . . . municipality, the arbitrator . . . shall take into account, to the extent that evidence is introduced, how the award will affect the municipal or county purposes element, as the case may be, of the local property tax; a comparison of the percentage of the municipal purposes element . . .; the impact of the award for each income sector of the property taxpayers of the local unit; the impact of the award on the ability of the governing body to (a) maintain existing local programs and services, (b) expand existing local programs and services for which public moneys have been designated by the governing body in a proposed local budget, or (c) initiate any new programs and services for which public moneys have been designated by the governing body in a proposed local budget.

[*N.J.S.A.* 34:13A–16(g)(6).]

Appeals from the interest arbitration award are decided by PERC, which may "affirm, modify, correct or vacate the award or may, at its discretion, remand the award to the same arbitrator or to another arbitrator . . . for reconsideration." *N.J.S.A.* 34:13A–16(f)(5)(a). The scope of our review of PERC decisions reviewing arbitration is "sensitive, circumspect and circumscribed." *Twp. of Teaneck v. Teaneck Firemen's Mut. Benevolent Ass'n Local No. 42,* 353 *N.J.Super.* 289, 300, 802 *A.*2d 569 (App. Div.2002), *aff'd,* 177 *N.J.* 560, 832 *A.*2d 315 (2003). PERC's "interpretation of the statute it is charged with administering . . .

is entitled to great weight," *In re Camden Cnty. Prosecutor, supra,* 394 *N.J.Super.* at 23, 925 *A.2d* 63, and its decision "will stand unless clearly arbitrary or capricious." *Teaneck, supra,* 353 *N.J.Super.* at 300, 802 *A.2d* 569. However, PERC's interpretation of the statute is entitled to no deference when its interpretation is "plainly unreasonable, contrary to the language of the Act, or subversive of the Legislature's intent[.]" *N.J. Tpk. Auth. v. AFSCME, Council 73,* 150 *N.J.* 331, 352, 696 *A.2d* 585 (1997) (internal citation omitted); *Twp. of Franklin v. Franklin Twp. PBA Local 154,* 424 *N.J.Super.* 369, 378, 37 *A.3d* 1162 (App.Div. 2012); *In re Camden Cnty. Prosecutor, supra,* 394 *N.J.Super.* at 23, 925 *A.2d* 63.

When a public interest arbitration award is reviewed, judicial scrutiny is "more stringent" because "such arbitration is statutorily-mandated and public funds are at stake." *Hillsdale, supra,* 137 *N.J.* at 82, 644 *A.2d* 564. In addition to the public interest and welfare, the public sector arbitrator is obligated to consider "the prevailing law[ ] in rendering any award." *Weiss v. Carpenter,* 143 *N.J.* 420, 431, 672 *A.2d* 1132 (1996) (citing *Tretina Printing, Inc. v. Fitzpatrick & Assocs., Inc.,* 135 *N.J.* 349, 364–65, 640 *A.2d* 788 (1994)); *see also Camden Bd. of Educ. v. Alexander,* 181 *N.J.* 187, 237, 854 *A.2d* 342 (2004).

In *Hillsdale,* the Supreme Court articulated principles that govern our review of the award [7] here:

---

[7] At the time *Hillsdale* was decided, the Compulsory Interest Award Arbitration Act provided that the parties were permitted to choose among several "terminal procedures" for the resolution of their dispute, including arbitration in which the award was confined to a choice between the last offers of the employer and the employees' representative. *Hillsdale, supra,* 137 *N.J.* at 81, 644 *A.2d* 564. *Hillsdale* concerned such a "last offer" arbitration. *See id.* at 82, 644 *A.2d* 564. When *N.J.S.A.* 34:13A–16 was amended in 2010, effective January 1, 2011, the selection of terminal procedures was deleted and all disputes were required to be resolved through binding arbitration pursuant to "conventional arbitration." *N.J.S.A.* 34:13A–16(d). The principles set forth in *Hillsdale* remain controlling despite the difference in resolution procedure.

[A] reviewing court may vacate an award when the decision fails to give "due weight" to the section 16g factors, when the award has been procured by corruption, fraud, or undue means, when arbitrators have refused to hear relevant evidence or committed other prejudicial errors, or when arbitrators have so imperfectly executed their powers that they have not made a final award[.] [*Hillsdale, supra*, 137 *N.J.* at 82, 644 *A.*2d 564 (internal citations omitted).]

## III

The City contends that the arbitrator exceeded his authority by stating the State was a "fourth party" to the arbitration and by concluding the State must fund the City's Fire Department budget, including salary increases. As a result, the City argues, PERC's decision to affirm the award was arbitrary and capricious. We agree.

The State was neither a party to the original CBA nor to the successor agreement the arbitrator was charged to craft. Therefore, the arbitrator lacked the authority to render an award that essentially required the State to assume funding responsibilities for the salary increases. *See Atlantic City v. Laezza*, 80 *N.J.* 255, 268, 403 *A.*2d 465 (1979). Indeed, both the City and the Union agree the arbitrator lacked the authority to make the State a party and that the award is not enforceable against the State. The net result is that the City is obligated to pay the salary increases awarded, regardless of the amount of aid received and without regard to the effect of the award on its ability to meet other financial demands or to avoid further layoffs.

As noted earlier, it was undisputed that the City was unable to fund the award from its own tax base. As the arbitrator acknowledged, State aid was shrinking at the time of the award. The Governor's exercise of a line-item veto [8] to strike the Transitional Aid Program for the State's budget for fiscal year 2012 eliminated approximately 40% of the City's budget for that year. The

---

[8] The Constitution grants the Governor the authority to object to any item or items included in an appropriation bill through the exercise of a selective veto. *N.J. Const.* art. V, § I, ¶ 15.

arbitrator recognized that "the continued downturn in the City and State economy" precluded an agreement that included both a conditional wage freeze and no further layoffs through December 31, 2012.

However, after taking stock of the toll the City's fiscal crisis had taken on the firefighting service, the arbitrator made a policy decision that the services could not be reduced further, that "equity mandated a reasonable adjustment of compensation" for the firefighters, and that "drastic steps were necessary to address the overwhelming budget obstacles." That determination laid the foundation for the award in which he stated "[t]he State must affirmatively provide for the City of Camden what the City cannot provide for itself[,]" and stated further, "the State cannot deny addition[al] aid or refuse to fund ... the City's Fire Department budget, whether for its operation or for modest Fire Fighter salary increases." In affirming the award, PERC reasoned that "the arbitrator's opinion regarding the City's dependence on State aid [was] a realistic assessment of the City's financial position."

We recognize that, in light of the City's financial straits, the challenge to provide both adequate firefighting service to the municipality and reasonable compensation to the firefighters presents a fiscal Gordian knot. But it was not within the arbitrator's authority to sever that knot by usurping both the authority granted by the New Jersey Constitution to the Legislature and Governor and governmental policy-making authority.

As a preliminary matter, the nature of the policy decision that is the keystone to the arbitration award is not a proper subject for arbitration. *See Teaneck, supra,* 353 *N.J.Super.* at 302, 802 *A.*2d 569 ("In the public sector, ... because the employer is government, the responsibility is to make and implement public policy through the political process, as opposed to negotiation and arbitration."); *see also N.J. Tpk. Auth. v. N.J. Tpk. Supervisors Ass'n,* 143 *N.J.* 185, 203, 670 *A.*2d 1 (1996); *In re Local 195,/IFPTE,* 88 *N.J.* 393, 404, 443 *A.*2d 187 (1982); *Kearny PBA Local No. 21 v. Town of Kearny,* 81 *N.J.* 208, 215, 405 *A.*2d 393 (1979) (stating

that "prerogatives of management, particularly those involving governmental policy making, cannot be bargained away to be determined by an arbitrator").

Moreover, "the power and authority to appropriate funds lie solely and exclusively with the legislative branch of government." *City of Camden v. Byrne*, 82 *N.J.* 133, 148, 411 *A.*2d 462 (1980); *see also N.J. Const.*, art. VIII, § II, ¶ 2; *Commc'ns Workers of Am. v. Florio*, 130 *N.J.* 439, 451, 617 *A.*2d 223 (1992); *Karcher v. Kean*, 97 *N.J.* 483, 489, 479 *A.*2d 403 (1984); *In re Deborah Heart & Lung Ctr. SFY 2009 Charity Care Subsidy Allocation*, 417 *N.J.Super.* 25, 30–31, 8 *A.*3d 250 (App.Div.2010). Because the Legislature's authority even includes the "inherent power to disregard" its own fiscal enactments, *Byrne, supra*, 82 *N.J.* at 147, 411 *A.*2d 462, "[t]here can be no redress in the courts to overcome either the Legislature's action or refusal to take action pursuant to its constitutional power over state appropriations." *Id.* at 149, 411 *A.*2d 462. The Court's proscription against the exercise of judicial authority aptly describes the limit on the arbitrator's authority here:

> It is not for the courts to weigh the equities in a case such as this. The Constitution has placed the State's conscience in these matters in the Legislature and it is that branch of government which must weigh the interests of its citizens at all levels of government.
>
> [*Id.* at 158, 411 *A.*2d 462.]

This is not to say that the arbitrator must disregard the State's contributions to the City in determining an appropriate award. Both the City and the State agree that the arbitrator may consider the historical facts, which include that the State has provided significant aid, continues to provide significant aid, and that such aid is decreasing, in determining an appropriate award.

## IV

The City also argues that the arbitrator's failure to follow substantive law constituted "undue means," requiring the award to

be vacated under *N.J.S.A.* 2A:24–8(a), and that, therefore, PERC's decision must be reversed. Again, we agree.

Although private parties may authorize an arbitrator "to decide legal issues as he deems fit irrespective of the governing law, this freedom is not available in the public sector." *Commc'ns Workers of Am., Local 1087 v. Monmouth Cnty. Bd. of Soc. Servs.*, 96 *N.J.* 442, 450, 476 *A.2d* 777 (1984). Instead, "the arbitrator in a public employment case is obliged to resolve it in accordance with the law and the public interest." *Id.* at 453, 476 *A.2d* 777.

Therefore, a court may vacate an award in a public sector case if it is contrary to existing law. *N.J. Tpk. Auth., supra,* 190 *N.J.* at 294, 920 *A.2d* 88.[9] Even under the criteria of *N.J.S.A.* 2A:24–8(a), an arbitrator's failure to follow the substantive law may also constitute "undue means" which would require the award to be vacated. *Jersey City Educ. Ass'n, Inc. v. Bd. of Educ.*, 218 *N.J.Super.* 177, 188, 527 *A.2d* 84 (App.Div.), *certif. denied,* 109 *N.J.* 506, 537 *A.2d* 1295 (1987); *see also Held v. Comfort Bus Line, Inc.*, 136 *N.J.L.* 640, 641–42, 57 *A.2d* 20 (Sup.Ct.1948). Thus, in *Monmouth Cnty. Bd. of Soc. Servs., supra,* 96 *N.J.* at 453–55, 476 *A.2d* 777, the Court vacated an arbitration award in part because the award *may* have violated applicable statutes and regulations. *See Weiss, supra,* 143 *N.J.* at 431, 672 *A.2d* 1132. Similarly, we vacated an award based upon an arbitrator's finding that any affirmative action hiring plan was illegal as "inconsistent with existing law and violative of the guidelines applicable to public sector arbitration." *Jersey City Educ. Ass'n, supra,* 218 *N.J.Super.* at 194, 527 *A.2d* 84.

---

[9] A court may also vacate an award if it is contrary to public policy. *Ibid.* To vacate an award on public policy grounds, the award itself must violate policy that is "embodied in legislative enactments, administrative regulations, or legal precedents," and may not be "based on amorphous considerations of the common weal." *Id.* at 295; *see also Middletown Twp., supra,* 193 *N.J.* at 11, 935 *A.2d* 516; *Borough of Glassboro v. Fraternal Order of Police, Lodge No. 108,* 197 *N.J.* 1, 10, 960 *A.2d* 735 (2008).

Here, it is argued that the arbitration award was inconsistent with *N.J.S.A.* 40A:10–21(b) and *N.J.S.A.* 40A:10–21.1.

*N.J.S.A.* 40A:10–21(b) states:

Commencing on the effective date [May 21, 2010] of P.L.2010, c. 2 and upon the expiration of any applicable binding collective negotiations agreement in force on that effective date, employees of an employer shall pay 1.5 percent of base salary, through the withholding of the contribution from the pay, salary or other compensation, for health care benefits coverage provided pursuant to N.J.S.40A:10–17, notwithstanding any other amount that may be required additionally pursuant to subsection a. of this section for such coverage....

The CBA here expired in December 2008, well before the effective date of the statute. As a result, the obligation to contribute 1.5% of base salary toward the cost of health care benefits commenced in May 2010.

Moreover, because the CBA had expired, any new agreement was also subject to the terms of *N.J.S.A.* 40A:10–21.1 when it became effective in June 2011. *See N.J.S.A.* 40A:10–21.1(d), (e). This statute phased in a new scale of employee contributions to health care benefits in which each employee paid a percentage of the cost of medical and prescription drug plan coverage pursuant to a scale based upon income set forth in *N.J.S.A.* 52:14–17.28(c), and further established that no employee would contribute less than 1.5% of base salary toward such coverage.

In his opinion, the arbitrator addressed this issue as follows:

If this Arbitrator is guided by the recent legislation (passed in June 2011), there are clear indications for substantial increases to that percent of salary for public sector employees['] contributions to health care premium coverage.

....

Candidly, while these questions have been addressed by the State Legislature, it is difficult for this Arbitrator to predict how recent or future legislative actions will ultimately alter public sector employee contributions for health care as it applies to the bargaining unit and collective bargaining. Nevertheless, this Arbitrator shall attempt to limit the present increase of contributions for the bargaining unit during the term of the Agreement in a relative proportion to salary increases awarded and shall direct the parties to implement the 1.5% (of base salary) co-pay contribution for health care (as the City has already accomplished) and, to the extent of the law, preclude further percentage increases during the term of this Agreement.

Article XXX, Section 16 of the Interest Arbitration Award accordingly provides, "*Effective upon the execution of a successor*

*agreement,* the employees shall contribute *1.5 %* of their base salary as a contribution for health insurance, as required by *N.J.S.A.* 40A:10–21." (Emphasis added.)

The Opinion and Award were issued August 14, 2011, after the effective date of *N.J.S.A.* 40A:10–21.1. Indeed, the arbitrator notes the statute was passed in June 2011, and that, "[if] guided" by that legislation, "there are clear indications for substantial increases" to the contributions the employees would be required to make. The arbitrator then "candidly" expresses uncertainty as to how legislative action will "ultimately" affect the amounts of contributions, and chooses to "attempt to limit" the contributions here to 1.5%. The arbitrator's action in declining to be "guided" by *N.J.S.A.* 40A:10–21.1, a statute that he recognized was in effect and applicable at the time of the award, was clearly contrary to law.

In addition to ignoring the amount the employees were required to contribute, the arbitrator also improperly delayed the time when the contributions would commence. As the arbitrator acknowledged, the City had been deducting 1.5% of the firefighters' base salary as required by *N.J.S.A.* 40A:10–21. Nonetheless, the arbitrator directed that implementation of the 1.5% contribution not commence until the execution of a successor agreement, contrary to the terms of *N.J.S.A.* 40A:10–21(b). *See Laezza, supra,* 80 *N.J.* at 269, 403 *A.*2d 465 (concluding that, if the arbitrator rendered an award without first considering its impact on the municipal budget cap, *see N.J.S.A.* 40A:4–45.2 and –45.3, "that award would be subject to vacation on grounds of procurement by 'undue means' "); *S. Plainfield Bd. of Educ., supra,* 320 *N.J.Super.* at 289–90, 727 *A.*2d 71.

The award here must, therefore, be vacated due to the arbitrator's failure to render an award consistent with statutory mandates governing the contributions employees were required to make toward their health benefits.

## V

The City argues further that the arbitrator failed to discharge his statutory obligation to "indicate which of the factors are deemed relevant, satisfactorily explain why the others are not relevant, and provide an analysis of the evidence on each relevant factor[.]" *N.J.S.A.* 34:13A–16(g). Again, we agree.

The arbitrator is required to give a "reasoned explanation" that reflects he gave "due weight" to the statutorily mandated criteria. As we have noted, the arbitrator was required by *N.J.S.A.* 34:13A–16(f)(5) to accompany his decision with a written report "explaining how each of the statutory criteria played into [his] determination of the final award."

The arbitrator here failed to meet these requirements. His discussion of the statutory factors was essentially limited to a discussion of the parties' positions as to each factor. He failed to identify which factors he deemed relevant or explain why any factor was not relevant to his determination. Although the language of his opinion does not obscure his personal view as to how the matter should be resolved, the opinion fails to provide the required analysis of the statutory criteria to support his conclusions.

The inadequacy of the arbitrator's findings are particularly evident in his discussion of "[t]he financial impact on the governing unit, its residents, ... and taxpayers." *N.J.S.A.* 34:13A–16(g)(6). Even when it is presumed that a municipality has the ability to pay an arbitration award, further analysis is required.[10] The terms of this factor "do not equate with the municipality's ability to pay." [11] *Hillsdale, supra,* 137 *N.J.* at 85,

---

[10] As noted, the statute also instructs the arbitrator as to the analysis required. *N.J.S.A.* 34:13A–16(g).

[11] Even when a municipality has a "perceived ability to pay" increases, an arbitration award may be properly vacated if the arbitrator places undue emphasis on a comparison with contracts negotiated in other municipalities.

644 *A.*2d 564. It is "not enough to simply assert that the public entity involved should merely raise taxes to cover the costs of a public interest arbitration award." *Id.* at 86, 644 *A.*2d 564. (quoting *Hillsdale PBA Local 207 v. Borough of Hillsdale,* 263 *N.J.Super.* 163, 188 n. 16, 622 *A.*2d 872 (App.Div.1993)).

Unlike *Hillsdale,* where there was a perceived ability to pay, there was a recognized inability to pay the award here. Moving past the fundamental error of assuming the State would fund the award, the decision failed to give adequate consideration to factors identified in *N.J.S.A.* 34:13A–16(g)(6) that the arbitrator was required to take into account, such as:

> the impact of the award on the ability of the governing body to (a) maintain existing local programs and services, (b) expand existing local programs and services for which public moneys have been designated by the governing body in a proposed local budget, or (c) initiate any new programs and services for which public moneys have been designated by the governing body in a proposed local budget.
>
> [*Ibid.*]

There was evidence here that the City's financial straits had already resulted in widespread layoffs of municipal employees and tax increases "to the max." There was further evidence that the award initially proposed by the arbitrator would have a significant and adverse impact on the ability of the City to maintain the already reduced staffing level of the fire department. Although the arbitrator accepted this evidence as credible, the decision failed to give due consideration to the impact of the award on the City in light of this evidence. As a result of this and other errors, the award must be vacated and PERC's decision must be reversed.

## VI

Finally, the City argues that this matter should be submitted to a different arbitrator upon remand. The City argues that the

---

*Hillsdale, supra,* 137 *N.J.* at 86, 644 *A.*2d 564; *see also Twp. of Washington v. N.J. State Policemen's Benevolent Ass'n, Inc., Local 206,* 137 *N.J.* 88, 92, 644 *A.*2d 573 (1994).

arbitrator failed to properly analyze the statutory factors and violated his duty of impartiality. The Union counters that there is insufficient reason to depart from the "standard remedy" of remanding the matter to the same arbitrator for a further analysis of the statutory factors, particularly in light of the additional delay in resolving this dispute that would result from referring this matter to a different arbitrator.

The grounds for vacating an arbitration award under *N.J.S.A.* 2A:24–8 are identical to those set forth in 9 *U.S.C.A.* § 10(a) for vacating an arbitration award under the Federal Arbitration Act (FAA), 9 *U.S.C.A.* §§ 1 to –16. Both statutes provide that an award may be vacated where the arbitrator demonstrated "evident partiality[.]" 9 *U.S.C.A.* § 10(a)(2); *N.J.S.A.* 2A:24–8(b). The Supreme Court observed that in authorizing this ground for vacating an award, Congress evinced its "desire ... to provide not merely for *any* arbitration but for an impartial one." *Commonwealth Coatings Corp. v. Cont'l Cas. Co.*, 393 *U.S.* 145, 147, 89 *S.Ct.* 337, 338, 21 *L.Ed.*2d 301, 304 (1968). Upon vacating an arbitration award, the court has the discretion to remand for further proceedings before the same arbitrator or to direct that the matter be heard by a different arbitrator. *N.J.S.A.* 34:13A–16(f)(5)(a); *see also Fox v. Morris Cnty. Policemen's Ass'n, P.B.A. 151*, 266 *N.J.Super.* 501, 520–21, 630 *A.*2d 318 (App.Div.1993), *certif. denied*, 137 *N.J.* 311, 645 *A.*2d 140 (1994); *Manchester Twp. Bd. of Educ. v. Carney, Inc.*, 199 *N.J.Super.* 266, 282, 489 *A.*2d 682 (App.Div.1985).

 Although a failure to fully analyze the mandatory statutory criteria will be sufficient to vacate an award, that failure alone will not be sufficient to require that the arbitration proceed before a different arbitrator upon remand. *See Hillsdale, supra,* 137 *N.J.* at 87, 644 *A.*2d 564; *Fox, supra,* 266 *N.J.Super.* at 521–22, 630 *A.*2d 318. However, when deficiencies in the arbitrator's process call into question the arbitrator's ability to have an open mind regarding the disposition, *see, e.g., Manchester Twp., supra,* 199 *N.J.Super.* at 282, 489 *A.*2d 682, a remand to a different

arbitrator may be appropriate. We are satisfied that the errors here are not mere deficiencies in the analysis of statutory factors that could be remedied by further review.

As the arbitrator acknowledged, he was charged "to render an Award regarding the terms and conditions of a successor Collective Bargaining Agreement ... after consideration of the statutory criteria of *N.J.S.A.* [3]4:13A–16(g)(1) through (9)." Nevertheless, his avowed "intention was to recognize the importance of the service provided the City by its Fire Fighters through a minimal wage increase[.]" To implement that intention, the arbitrator rendered an award he acknowledged the City was unable to pay; ignored statutes he knew to be in effect in an "attempt" to shield the employees from legislatively mandated increases in employee contributions to health benefits; and, sua sponte, in the absence of any authority, called the State "a fourth party" to the arbitration and the presumptive source of funds necessary to fund the award. The nature of these errors suggests a commitment to the arbitrator's stated intention and requires the matter proceed before a different arbitrator. *See State v. Thompson,* 405 *N.J.Super.* 163, 172, 963 *A.*2d 884 (App.Div.2009), *certif. denied,* 209 *N.J.* 232, 36 *A.*3d 1064 (2012); *R.* 1:12–1(d).

PERC's decision to affirm the award is reversed, the arbitration award is vacated and this matter is remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.