PRECEDENTIAL
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-2345
_____

JUDITH GOLDMAN;
KENNETH B. GOLDMAN,
Appellants

v.

CITIGROUP GLOBAL MARKETS INC; FINRA;
FREDERICK PIERONI; BARRY GUARIGLIA
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-12-cv-04469)
District Judge:  Hon. Anita B. Brody
_____

Argued
April 28, 2016

Before:  McKEE, *Chief Judge*, JORDAN, and ROTH, *Circuit
Judges*.

(Filed: August 22, 2016)
_____

Richard J. Gerace   [ARGUED]
Gerace Law Office
1515 Market Street – Suite 1200
Philadelphia, PA   19102
        *Counsel for Appellants*

Brian T. Feeney   [ARGUED]
Christiana L. Signs
Greenberg Traurig, LLP
2001 Market Street – Suite 2700
Philadelphia, PA   19103
        *Counsel for Appellees*

_____

OPINION OF THE COURT

_____

JORDAN, *Circuit Judge*.

Judith and Kenneth Goldman filed a motion in the United States District Court for the Eastern District of Pennsylvania to vacate an adverse arbitration award. The underlying arbitration, before a panel operating under the auspices of the Financial Industry Regulatory Authority ("FINRA"), concerned the Goldmans' allegations that financial advisor Barry Guariglia and Citigroup Global Markets Inc. had violated federal securities law in their management of the Goldmans' brokerage accounts. The District Court dismissed the case for lack of subject-matter jurisdiction because the Goldmans' motion failed to raise a substantial federal question. We will affirm.

## I. Background

### A. Factual Background

This case has its roots in the relationship between the Goldmans and their former financial advisor, Mr. Guariglia, a relationship that began in the 1990s, when he was working for the wealth management firm Merrill Lynch. In 2008, Guariglia changed his employment to Merrill Lynch's competitor Citigroup Global Markets Inc. ("CGMI"), and he persuaded the Goldmans to follow him there.[1]

After the Goldmans lost money in the stock market, they alleged that they were pushed into "short-term trading of high-risk, speculative securities" that were "far outside [their] investment objectives," and that Merrill Lynch and CGMI and their employees "knew it." (App. 17.) They also alleged that Guariglia and his colleagues induced the Goldmans to take on ever more unsustainable risk by trading on margin. Most important to the case at bar, the Goldmans contend that, when they transferred their account from Merrill Lynch (where they say they received favorable margin requirement treatment) to CGMI (where they allegedly faced a higher margin requirement), they were subjected to a "devastating margin call," leading to the liquidation of a "sizable portion of their investments" and "the loss of their entire retirement." (Opening Br. at 7.)

---

[1] CGMI has since changed its name to Morgan Stanley Smith Barney LLC. The Goldmans maintained accounts with a unit of CGMI then called Smith Barney.

### B. Procedural Background

#### 1. Arbitration Proceedings before FINRA

Based on those allegations, in 2010 the Goldmans initiated FINRA arbitration proceedings against Merrill Lynch, CGMI, Guariglia, and other employees of those financial institutions. They asserted claims on the following bases: securities fraud in violation of the Securities Exchange Act of 1934 (the "'34 Act"), 15 U.S.C. § 78a *et seq.*, and Rule 10b-5, 17 C.F.R. § 240.10b-5; fraudulent misrepresentation; lack of supervision of employees; lack of suitability of investment recommendations; breach of fiduciary duty; breach of contract; and negligence.

The FINRA proceedings began with mediation before a neutral named Ferdinand Pieroni, and the mediation succeeded in producing a settlement for the Goldmans with Merrill Lynch, but not with CGMI.[2] The Goldmans now allege that CGMI refused to negotiate in good faith, left the mediation when the Goldmans so demanded, and then "snuck back in[] ... through a side door" to "spy" on the confidential negotiations between the Goldmans and Merrill Lynch. (Opening Br. at 9.) CGMI flatly denies those allegations, and mediator Pieroni filed a sworn affirmation before the FINRA arbitration panel declaring that CGMI did not refuse to mediate, was never asked to leave the mediation, and acted in good faith.

---

[2] At this point and hereafter, for simplicity, we will refer to Guariglia and CGMI collectively as "CGMI."

4

The arbitration panel took evidence and heard argument for 10 days between August 2012 and February 2014. After the Goldmans presented their full case in chief, CGMI moved to dismiss for lack of evidence. The panel granted the motion, concluding that, "[w]hile all the claims were quite stridently argued, not a single claim was proven to be true by evidence." (App. 109.) In particular, the panel noted that the Goldmans "failed to offer a scintilla of proof" that they were subject to a margin call. (*Id.*) The panel thus determined that "there was no margin call" (*id.*), and, on October 2, 2014, it issued a final award dismissing the Goldmans' claims and assigning administrative fees among the parties.

## 2. District Court Proceedings

During the mediation and arbitration proceedings before FINRA, the Goldmans resorted to the District Court, claiming a breach of contract. More specifically, in a lengthy complaint, the Goldmans alleged that CGMI had not honored its promise to mediate, that "CGMI and its lawyers were allowed to spy on ... confidential discussion[s] and negotiation[s]" (App. 47), and that the arbitration panel was conflicted and partial. Based on those allegations, the complaint alleged that CGMI, Guariglia, FINRA, and Pieroni "breached express and implied terms and conditions of the FINRA[] Arbitration and Mediation contracts" (App. 49), and acted "[i]n utter defiance of [FINRA mediation] rules" (App. 50). They immediately moved for a temporary restraining order and preliminary injunction to stay the arbitration and to have CGMI's law firm, Greenberg Traurig, barred from the case. The District Court denied the motion, holding that there was "no lawful basis" for relief and that the Goldmans had

5

improperly asked the Court to intervene "as an emergency court of interlocutory appeals from arbitration orders." (App. 85.) After a different judge was assigned the case, the District Court denied a second motion for a temporary restraining order, then subsequently dismissed the case with instructions to re-file after the arbitration was concluded, if the Goldmans wished to challenge any resulting arbitration award. There was another false start in the summer of 2014, when the Goldmans filed a motion to vacate the arbitration award before it was actually finalized, and that motion too was dismissed.

When the arbitration was finally completed, the Goldmans returned to the District Court by submitting what they styled as a "refiled" motion to vacate the arbitration award, which is the motion now at issue.[3] In their motion, they asserted that the District Court had jurisdiction under § 10 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 10,

---

[3] The FAA provides that "the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration." 9 U.S.C. § 10(a). "Notice of a motion to vacate ... must be served upon the adverse party or his attorney within three months after the award is filed or delivered." 9 U.S.C. § 12. Therefore, unlike in most federal actions that are initiated with a complaint, when a litigant is seeking to vacate an arbitration award under the FAA, "such a request for relief shall be made in the form of a motion," and a party need not "initiate a challenge to an arbitration award by filing a complaint." *O.R. Sec., Inc. v. Prof'l Planning Assocs., Inc.*, 857 F.2d 742, 745 (11th Cir. 1988) (internal quotation marks omitted).

and, to justify vacatur of the award, they alleged that the FINRA arbitration panel behaved improperly in that it demanded "voluminous" and irrelevant discovery from them (App. 289), did not permit sufficient discovery of CGMI's documents, exhibited partiality towards CGMI, and "refused to resign" at the Goldmans' request (App. 295). The Goldmans also alleged that CGMI's counsel negotiated in bad faith and then spied on the meditation proceedings, and that the mediator perjured himself in denying that the spying occurred. Resorting to the typographical arts and extravagant language, the Goldmans practically shout that

> the treatment of the FINRA members demonstrates to the reasonable person that unavoidably, the Panel was partial to one side and the favorable treatment unilateral. ... <u>Defendants</u> use the "BIG LIE" to maximize the advantage they enjoyed in the FINRA forum as a FINRA member and associated member. ... The Biggest of the "Big Lies" is <u>Defendants</u>' persistent perjury that "***THERE WAS NO MARGIN CALL***" upon transfer of the Goldman accounts from Merrill Lynch to <u>Defendants</u> in November 2008.

(App. 297-98 (original emphasis and formatting).)

In response to the motion to vacate, CGMI moved to dismiss for lack of subject-matter jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(1).[4] The District Court

---

[4] While litigation proceeded in the District Court, CGMI separately sought confirmation of the FINRA

7

granted that motion. Its opinion began by observing that the FAA does not itself create federal subject-matter jurisdiction and that the parties in this case are not diverse, so that federal question jurisdiction, independent of the FAA, would be required for the District Court to consider a motion to vacate an arbitration award. The Court then rejected the three bases for federal question jurisdiction that the Goldmans press before us. It also denied their motion for leave to file an amended motion to vacate because, in seeking leave to amend, they simply sought to "assert the same claims they unsuccessfully brought in their arbitration before FINRA."[5] (App. 3 n.1.)

---

arbitration award in the Superior Court of Essex County, New Jersey. After the District Court dismissed the Goldmans' case for lack of jurisdiction, the New Jersey Superior Court granted the motion to confirm the arbitration award pursuant to N.J. Stat. Ann. § 2A:24-7, which provides that "confirmation shall be granted unless the award is vacated, modified or corrected." The Goldmans have appealed that order, and the appeal is pending in the New Jersey courts. Of note, "[t]he grounds for vacating an arbitration award under [New Jersey law] are identical to those set forth ... for vacating an arbitration award under the Federal Arbitration Act." *In re City of Camden*, 58 A.3d 1186, 1204 (N.J. Super. Ct. App. Div. 2013).

[5] In cursory fashion, the Goldmans ask us to reverse the District Court's order denying them leave to file an amended motion to vacate. They make no specific argument, however, for why the District Court abused its discretion in denying them leave to amend. *See Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 163 (3d Cir. 2010) ("We review a district court decision refusing

8

The Goldmans timely appealed.

## II.    Jurisdiction and Standard of Review

Whether the District Court had jurisdiction is precisely the issue on appeal.  We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.  We exercise plenary review over a district court's dismissal of an action for lack of subject matter jurisdiction.  *Nichole Med. Equip. & Supply, Inc. v. TriCenturion, Inc.*, 694 F.3d 340, 347 (3d Cir. 2012).  Because CGMI's attack on jurisdiction is facial, we consider only the allegations in the motion to vacate and the documents referenced in that motion and attached thereto, "in the light most favorable to the plaintiff."  *Id*. (internal quotation marks omitted).

## III.    Discussion

The Goldmans argue that the District Court had jurisdiction under 28 U.S.C. § 1331,[6] which provides

---

leave to amend ... for abuse of discretion.").  Because "arguments raised in passing ..., but not squarely argued, are considered waived," *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997), any argument about leave to amend "need not be addressed" by us, *Kost v. Kozakiewicz*, 1 F.3d 176, 182 (3d Cir. 1993).

[6] In their reply brief, the Goldmans also belatedly assert that the kind of claim they are bringing is "exclusive to federal courts under 15 U.S.C. § 78aa(a)."  (Reply Br. at 6.)  That provision provides exclusive jurisdiction to federal district courts for "all suits in equity and actions at law

jurisdiction for "civil actions arising under" federal law.[7] Such "federal question" jurisdiction may arise in two ways. "Most directly, a case arises under federal law when federal law creates the cause of action asserted." *Gunn v. Minton*, 133 S. Ct. 1059, 1064 (2013) (citing *American Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 260 (1916)). However, even if the cause of action is based on state law, there is a "special and small category of cases in which arising under jurisdiction still lies." *Id.* (internal quotation marks omitted). In those special cases, which depend for jurisdiction on the analysis set forth in the Supreme Court's opinion in *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308, 314 (2005), "federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn*, 133 S. Ct. at 1065 (summarizing the

---

brought to enforce any liability or duty created by [the '34 Act] or the rules and regulations thereunder." 15 U.S.C. § 78aa(a). The Supreme Court, however, recently confirmed our Circuit's holding that 15 U.S.C. § 78aa(a) should be "read ... as conferring exclusive federal jurisdiction of the same suits as 'aris[e] under' the ['34 Act] pursuant to the general federal question statute." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, No. 14-1132, 2016 WL 2842450, at *5 (U.S. May 16, 2016). We therefore apply the "arising under" analysis for 28 U.S.C. § 1331 to this case.

[7] Both sides agree that diversity jurisdiction does not apply in this case, as the Goldmans and Guariglia are all citizens of New Jersey.

10

jurisdictional test set forth in *Grable*). For both forms of federal question jurisdiction – the ordinary variety and the rarer *Grable* type – the party asserting jurisdiction must satisfy the "well-pleaded complaint rule," which mandates that the grounds for jurisdiction be clear on the face of the pleading that initiates the case. *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 9-11 (1983). In short, "a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Id.* at 27-28.

The FAA does not itself provide a federal cause of action for vacatur of an arbitration award. Instead, as the Supreme Court has explained,

> [t]he Arbitration Act is something of an anomaly in the field of federal-court jurisdiction. It creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate, yet it does not create any independent federal-question jurisdiction under 28 U.S.C. § 1331 or otherwise. ... [H]ence, there must be diversity of citizenship or some other independent basis for federal jurisdiction before [an] order can issue. ... [A]lthough enforcement of the Act is left in large part to the state courts, it nevertheless represents federal policy to be vindicated by the federal courts where otherwise appropriate.

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 n.32 (1983) (internal citations omitted); *see also*

11

*V.I. Hous. Auth. v. Coastal Gen. Constr. Servs. Corp.*, 27 F.3d 911, 915 (3d Cir. 1994) ("[T]he Arbitration Act does not supply federal jurisdiction where it does not otherwise exist.").[8]   Therefore, the FAA does not provide a federal cause of action to ground subject-matter jurisdiction for the Goldmans' motion to vacate.

We must look, then, to the Goldmans' allegations to see whether they somehow raise a basis for jurisdiction, other than by the incorrect assertion that § 10 independently provided the District Court "jurisdiction to hear and decide" the motion to vacate.  (App. 287.)  Because the Goldmans' "'refiled' motion to vacate" is the filing that brought the dispute to the District Court after the Court had dismissed their requests to stay the arbitration proceedings, the allegations of that motion are the ones to which we apply the well-pleaded complaint rule.  (App. 284.)  Though that motion meanders, it does make something apparent: the Goldmans point to no federal law as the reason there should be a vacatur.  Instead, they reference Pennsylvania state law governing vacatur of arbitration awards and then proceed to discuss the indignities they allegedly suffered during the arbitration proceedings.  Lengthy though the motion to vacate is, it is entirely about the arbitration process.  The Goldmans complain of a "bitter prehearing arbitration discovery process" (App. 289), "evident partiality of the [arbitration]

_____

[8] The Goldmans argue that the "plain language" of § 10 of the FAA creates a federal cause of action and that we should read it to do so to give it "the dignity of plain meaning."  (Opening Br. at 24.)  They acknowledge, however, that their interpretation is contrary to our precedent, so we do not consider that argument further.

12

Panel" (App. 290), "paltry" discovery production from CGMI (App. 291), CGMI being "allowed to spy" on confidential mediation negotiations (App. 292), the mediator's alleged perjury, the arbitration panel's "manifest[] disregard[] [of] the existence of a margin call" (App. 298), "falsification of records" (App. 299), and "contemptuous treatment by the Panel Chair of the Goldmans" (App. 301). All of those grievances are variations on the theme that the contract to arbitrate was undermined by "blatant misconduct by" CGMI, despite CGMI's obligation "to arbitrate properly under the FINRA A[rbitration] Submission Agreement," and that CGMI's misconduct was "insidiously tolerated by a panel sworn to be impartial." (App. 300 (emphasis omitted).) The essence of the motion to vacate is therefore a breach of contract complaint, alleging that CGMI, with the aid of the FINRA panel, engaged in procedural chicanery and failed to honor the agreement to arbitrate. That basic contract claim arises under state, not federal, law.

Lacking a federal cause of action to support jurisdiction, the Goldmans must rely on *Grable* to establish that their "state-law claim necessarily raise[s] a ... federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." 545 U.S. at 314. They present three theories for why their motion to vacate does so. First, they say that federal courts may "look through" a motion to vacate to the subject matter of the underlying arbitration, and that, because the underlying arbitration in this case involved federal securities law claims, the District Court had jurisdiction. Second, they contend that, because they alleged that the FINRA panel manifestly disregarded federal law,

13

they have raised a federal question. Finally, they say that the FINRA procedures at issue here are so integrally related to federal law that disputes over those procedures raise federal questions. We consider each jurisdictional theory in turn, ultimately agreeing with the District Court that none satisfies the stringent *Grable* test for federal question jurisdiction in the absence of a federal cause of action.

## A. Look-Through

### 1. *Athena Venture*'s Jurisdictional Statement

To support their argument that a district court should "look through" a motion to vacate and examine the subject matter of the underlying arbitration, the Goldmans principally rely upon an opinion that our Court issued after the District Court dismissed the motion to vacate. That opinion, from a case called *Goldman, Sachs & Co. v. Athena Venture Partners, L.P.*, included a footnote indicating that a district court has subject-matter jurisdiction over a § 10 motion to vacate "pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78aa(a) because the underlying arbitration included federal securities law claims." 803 F.3d 144, 147 n.5 (3d Cir. 2015).

Were that statement of law binding on us, the Goldmans would be correct that the District Court had jurisdiction over their motion to vacate. But we are not bound to follow *Athena Venture*, for two independently sufficient reasons.

First, a summary and unexplained jurisdictional ruling like the one in that case has no precedential effect. Using a

14

colloquialism, we have previously observed that "[a] drive-by jurisdictional ruling, in which jurisdiction has been assumed by the parties, and assumed without discussion by the court, does not create binding precedent." *United States v. Stoerr*, 695 F.3d 271, 277 n.5 (3d Cir. 2012) (internal quotation and editorial marks omitted). "We therefore are not bound by the bald jurisdictional statement" in a prior opinion of our Court. *Id.* That understanding comports with similar instruction from the Supreme Court, reaching back to Chief Justice Marshall, who held that there is nothing binding in "a prior exercise of jurisdiction in a case where it was not questioned and it was passed sub silentio." *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998) ("We have often said that drive-by jurisdictional rulings ... have no precedential effect.").

The *Athena Venture* footnote represents just such an unexamined exercise of jurisdiction and so is without precedential effect. Jurisdiction was not disputed, and the case instead revolved entirely around a merits question of whether constructive knowledge of an arbitrator's misrepresentation could trigger forfeiture of a misconduct claim in a subsequent motion to vacate. *See Athena Venture*, 803 F.3d at 147-48. The jurisdictional footnote was merely a recapitulation of the jurisdictional statement from the appellants' brief, which was itself unaddressed by the appellees. *Compare id.* at 147 n.5 *with* Brief of Appellants at 1, *Goldman, Sachs & Co. v. Athena Venture Partners, L.P.*, 803 F.3d 144 (3d Cir. 2015) (No. 13-3461), 2014 WL 1315263. Had the adversarial process properly put jurisdiction in issue, we doubt that the jurisdictional ruling

15

would have been the same. Indeed, it could not have been,[9] which is the second reason that *Athena Venture* does not bind us on the question of jurisdiction: it is contrary to our own prior precedent.

"In the unique circumstance when our panel decisions conflict and our Court has not spoken en banc, ... the earlier decision is generally the controlling authority." *United States v. Tann*, 577 F.3d 533, 541 (3d Cir. 2009). Long before *Athena Venture*, in a case called *Virgin Islands Housing Authority v. Coastal General Construction Services Corp.*, we applied the well-pleaded complaint rule to a § 10 motion to vacate and refused to look through to the claims in the underlying arbitration, so that jurisdiction would not lie where the allegations "did not include any reference to a federal statute other than the Arbitration Act." 27 F.3d at 915. "[N]ot only must federal jurisdiction exist aside from the Arbitration Act, but the independent basis must appear on the face of the complaint." *Id.* We found jurisdiction lacking where the pleadings did not "contain allegations sufficient under the well-pleaded complaint rule to support a finding of a substantial federal question." *Id.* Therefore, even if the *Athena Venture* jurisdictional statement were anything more than our Court's unexplained acceptance of the parties' representations about jurisdiction, it would nonetheless be trumped by the prior holding in *Coastal General*.

---

[9] That is not to say that the Court could not have determined there was jurisdiction on some other theory, only that it could not have relied on the look-through theory.

16

### 2. *Vaden* and the Difference Between § 4 and § 10 of the FAA

To overcome the precedential force of *Coastal General*, the Goldmans need to point to some intervening change in the law. The closest they come is their invocation of the Supreme Court's opinion in *Vaden v. Discover Bank*, 556 U.S. 49, 62 (2009), which held that "[a] federal court may 'look through' a § 4 petition [to compel arbitration] to determine whether it is predicated on an action that 'arises under' federal law." The Goldmans argue that we should apply that same look-through treatment to § 10 motions to vacate arbitration awards. While there may be some superficial appeal to treating a § 10 motion to vacate an arbitration award in the same manner as a § 4 motion to compel arbitration, a close reading of *Vaden* and the relevant provisions of the FAA undercuts the Goldmans' argument.

To begin with, the *Vaden* opinion made clear that it was doing nothing to disturb the well-pleaded complaint rule or the general proposition that the FAA provides no federal cause of action. Specifically, the Court reaffirmed that federal question jurisdiction under 28 U.S.C. § 1331 works the same for FAA suits as for any others, so that, "[u]nder the longstanding well-pleaded complaint rule, ... a suit 'arises under' federal law 'only when the plaintiff's statement of his own cause of action shows that it is based upon [federal law].'" *Id.* at 60 (quoting *Louisville & Nashville R. Co. v. Mottley*, 211 U.S. 149, 152 (1908)). The Court also said,

> [t]he body of federal substantive law generated by [the FAA] is equally binding on state and federal courts. ... [The FAA] bestows no

17

federal jurisdiction but rather requires for access to a federal forum an independent jurisdictional basis over the parties' dispute. Given the substantive supremacy of the FAA, but the Act's nonjurisdictional cast, state courts have a prominent role to play as enforcers of agreements to arbitrate.

*Id*. at 59 (internal quotation marks, editorial marks, and citations omitted).

In explaining why the well-pleaded complaint rule was relaxed for § 4 petitions to allow look-through to the underlying dispute's subject-matter, the Court focused on the unique language of that portion of the statute, saying, "[t]he text of § 4 drives our conclusion that a federal court should determine its jurisdiction by 'looking through' a § 4 petition to the parties' underlying substantive controversy." *Id.* at 62. According to that text:

A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, *save for such agreement*, would have jurisdiction under Title 28, in a civil action or in admiralty *of the subject matter of a suit arising out of the controversy between the parties*, for an order directing that such arbitration proceed in the manner provided for in such agreement.

9 U.S.C. § 4 (emphasis added). The Supreme Court concluded that "[t]he phrase 'save for [the arbitration]

18

agreement' indicates that the district court should assume the absence of the arbitration agreement and determine whether it 'would have jurisdiction under title 28' without it."  *Vaden*, 556 U.S. at 62.

In addition to giving effect to the words of that provision, the Court reasoned that failing to look through a § 4 petition to the underlying dispute would have "curious practical consequences":

> It would permit a federal court to entertain a § 4 petition only when a federal-question suit is already before the court, when the parties satisfy the requirements for diversity-of-citizenship jurisdiction, or when the dispute over arbitrability involves a maritime contract. [Failing to look through] would not accommodate a § 4 petitioner who *could* file a federal-question suit in (or remove such a suit to) federal court, but who has not done so.  In contrast, when the parties' underlying dispute arises under federal law, the "look through" approach permits a § 4 petitioner to ask a federal court to compel arbitration without first taking the formal step of initiating or removing a federal-question suit – that is, without seeking federal adjudication of the very questions it wants to arbitrate rather than litigate.

*Id.* at 65.

Neither the textual nor practical considerations noted by the Court in *Vaden* apply in a case relying on § 10 of the

19

FAA.  Section 10 lacks the critical "save for such agreement" language that was central to the Supreme Court's *Vaden* opinion.  It provides that "the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration ... ."  9 U.S.C. § 10.  There is no reference to the subject matter of the underlying dispute.  Thus, while § 4 calls for a court to consider whether it would have jurisdiction over the "subject matter of a suit arising out of the controversy between the parties," § 10 makes no such demand.

We therefore join other courts in holding that § 4 of the FAA should be read differently than § 10 for jurisdictional purposes.  Before *Vaden*, the United States Court of Appeals for the D.C. Circuit had noted that, even if § 4 provides look-through federal question jurisdiction, "the same words are not in § 10."  *Kasap v. Folger Nolan Fleming & Douglas, Inc.*, 166 F.3d 1243, 1247 (D.C. Cir. 1999).  Earlier still, the United States Court of Appeals for the Seventh Circuit ruled that there was "no reason to artificially import the language" of § 4 "into § 10, since we do not believe it is necessarily anomalous for Congress to have intended that federal courts take jurisdiction for purposes of a motion to compel where the underlying dispute is federal, but not take jurisdiction on a parallel motion to vacate."  *Minor v. Prudential Sec., Inc.*, 94 F.3d 1103, 1107 (7th Cir. 1996).  Explaining why Congress may have treated petitions to compel arbitration and motions to vacate differently, the Seventh Circuit opined that:

> The central federal interest was enforcement of agreements to arbitrate, not review of

20

arbitration decisions. Thus it would be reasonable for Congress to give federal courts the responsibility of ensuring arbitration agreements are upheld in cases where the courts would otherwise have jurisdiction. However, once the arbitration agreement is enforced, there exists no compelling need for the federal courts to be involved, unless a federal question is actually at issue or diversity is established. The central goal of the FAA will already have been addressed, and well-established rules of federal jurisdiction, including the well-pleaded complaint rule, should govern. Accordingly, merely because a district court may have jurisdiction over a motion to compel arbitration where an underlying federal question is at stake ... does not mean the same holds true in the context of a § 10 motion to vacate.

*Id.* (internal quotation marks, editorial marks, and citation omitted).

The Seventh Circuit's policy rationale meshes exactly with the *Vaden* Court's subsequent "practical consequences" argument, 556 U.S. at 65, in explaining why look-through need not apply in the § 10 context. As the Supreme Court noted in *Vaden*, the reason for a petition to compel arbitration is to resolve the dispute through arbitration rather than going to court, so it would be contrary to the purpose of § 4 to require the petitioner to first bring suit. *Id.*

That logic, however, does not apply to § 10, which takes effect only when the arbitration has concluded. When

21

seeking to vacate the result of an arbitration that has already occurred, the movant is challenging the procedural propriety of the arbitration, which is unrelated to the subject matter of the underlying dispute. The present case is a prime example. The Goldmans complain that they were subject to "voluminous" and "oppressive" discovery demands (App. 289), a "blatantly partial" arbitration panel (App. 289), respondents who "blatantly conceal[ed] evidence" (App. 292), "reprehensible conduct" from CGMI's lawyers (App. 293), and mediator "perjury" (App. 293). Those are procedural criticisms. There is, in other words, no federal question which a district court could consider in a § 10 dispute such as this one; whereas, in a § 4 case, the petitioner always could have brought a federal question suit before requesting that the court send the matter to arbitration.

In concluding that *Vaden*'s "look-through" basis for jurisdiction does not extend to § 10 motions to vacate, we adopt the reasoning of the Seventh Circuit's recent decision in *Magruder v. Fidelity Brokerage Services LLC*, No. 15-1846, 2016 WL 1059469 (7th Cir. Mar. 17, 2016). As discussed there, rejecting look-through in cases involving §§ 9 and 10 of the FAA "harmonizes the law of arbitration with the law of contracts."[10] *Id.* at *3.

---

[10] Section 9 of the FAA governs confirmation of arbitration awards and provides that "at any time within one year after the award is made any party to the arbitration may apply to the court ... for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected ... ." 9 U.S.C. § 9. Like § 10, § 9 has none of the look-through language of § 4 that undergirds the *Vaden* opinion.

22

Put FINRA and its rules aside for a moment and consider what would have happened if [the plaintiff] had sued [the defendant] under the federal securities laws ... . Most litigation ends in settlement – which is to say, in a contract. If [the parties] had reached a contractual solution but later disagreed about performance, could they return to federal court under the securities laws? The answer is no.

*Id.* (citing *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375 (1994)). In short, "[the] conclusion ... that a federal question can suffice to order arbitration under § 4, but not to enforce or set aside the decision under § 9 or § 10, parallels the distinction ... between an original federal claim and a dispute about its contractual resolution." *Id.*

We therefore hold that a district court may not look through a § 10 motion to vacate to the underlying subject matter of the arbitration in order to establish federal question jurisdiction. Instead, the traditional well-pleaded complaint rule applies so that the motion to vacate must, on its face, "necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable*, 545 U.S. at 314.

## B. Application of the Well-Pleaded Complaint Rule

Having concluded that we apply the well-pleaded complaint rule to § 10 motions, without look-through, we

23

next address the two arguments that the Goldmans make for why they have nonetheless established federal question jurisdiction.

### 1.    Manifest Disregard

First, the Goldmans argue that their motion to vacate raises a substantial federal question on its face because it asserts that the arbitration panel showed a manifest disregard for federal law.  "Manifest disregard" is a judicially-created doctrine by which "[a] district court may ... vacate an arbitrator's decision [that] evidences a manifest disregard for the law rather than an erroneous interpretation of the law." *Dluhos v. Strasberg*, 321 F.3d 365, 370 (3d Cir. 2003) (internal quotation and editorial marks omitted).  The Goldmans say that the FINRA panel "manifestly disregarded" the statutory language of 15 U.S.C. § 78g,[11] as well as its implementing regulation 12 C.F.R. § 220.12,[12] when it

---

[11] As relevant here, 15 U.S.C. § 78g establishes margin requirements "[f]or the purpose of preventing the excessive use of credit for the purchase or carrying of securities" by mandating that "the Board of Governors of the Federal Reserve System shall ... prescribe rules and regulations with respect to the amount of credit that may be initially extended and subsequently maintained on any security ... ."  *Id.* § 78g(a).

[12] In the portion of 12 C.F.R. § 220.12 relied upon by the Goldmans, the regulation provides:
> The required margin for each security position held in a margin account shall be as follows:

24

concluded that no margin call had occurred. (App. 298.) Without further explanation, they assert that "[t]he plain language" of the regulation demonstrates that a margin call must have occurred, contrary to the FINRA panel's conclusion.

The regulation that the Goldmans invoke sets "initial margin requirements for certain equity securities at '50 percent of the current market value of the security or the percentage set by the regulatory authority where the trade occurs, whichever is greater.'" *WC Capital Mgmt., LLC v. UBS Sec., LLC*, 711 F.3d 322, 328 (2d Cir. 2013) (quoting 12 C.F.R. § 220.12(a)). "If the value of the securities and other acceptable property held in a margin account falls below the required margin level, a broker may issue a 'margin call' notifying the account owner that it will need to either post additional collateral or sell some of its securities in the account to satisfy the collateral requirements." *Id.* Presumably, the Goldmans are suggesting that their margin account fell below the level required by the regulation, so that a margin call must have been made.

---

(a) Margin equity security, except for an exempted security, money market mutual fund or exempted securities mutual fund, warrant on a securities index or foreign currency or a long position in an option: 50 percent of the current market value of the security or the percentage set by the regulatory authority where the trade occurs, whichever is greater.

*Id.* § 220.12(a).

Without taking a position on the merits of that argument, we agree with the District Court that the Goldmans' invocation of 15 U.S.C. § 78g and 12 C.F.R. § 220.12 is insufficient to raise a substantial question of federal law in their motion to vacate. Even if "manifest disregard" is a valid basis for vacatur,[13] it can only support

[13] The continued validity of manifest disregard as a basis for vacating arbitration awards has been thrown into doubt by the Supreme Court's holding in *Hall Street Associates, L.L.C. v. Mattel, Inc.* that "§§ 10 and 11 respectively provide the FAA's exclusive grounds for expedited vacatur and modification." 552 U.S. 576, 584 (2008). Subsequently, the Court expressly declined to "decide whether 'manifest disregard' survives ... *Hall Street* ... as an independent ground for review or as a judicial gloss on the enumerated grounds for vacatur set forth at 9 U.S.C. § 10." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 672 n.3 (2010). The Courts of Appeals have divided on the answer to that question. *Compare Comedy Club, Inc. v. Improv W. Assocs.*, 553 F.3d 1277, 1290 (9th Cir. 2009) (holding that manifest disregard survives as "shorthand for ... 9 U.S.C. § 10(a)(4), which states that the court may vacate 'where the arbitrators exceeded their powers'"), *with Affymax, Inc. v. Ortho-McNeil-Janssen Pharm., Inc.*, 660 F.3d 281, 285 (7th Cir. 2011) (holding that after *Hall Street*, "'manifest disregard of the law' is not a ground on which a court may reject an arbitrator's award under the Federal Arbitration Act"). Because we conclude that the Goldmans' manifest disregard claim does not raise a substantial question of federal law, we need not inquire into

26

federal question jurisdiction "where ... the petitioner complains *principally* and in good faith that the award was rendered in manifest disregard of federal law ... ." *Greenberg v. Bear, Stearns & Co.*, 220 F.3d 22, 27 (2d Cir. 2000) (emphasis added).

The Goldmans do not meet that standard because the legal issues they raise are, at most, merely supportive of their principal complaint that partiality, corruption, and ineptitude infected the arbitration process. More broadly, the Goldmans fail to establish any of the four parts of the *Grable* test with their manifest disregard claim. The claim does not "necessarily raise a ... federal issue," nor is the federal issue in question "substantial," *Grable*, 545 U.S. at 314, because the margin regulations are invoked simply as evidence for the factual claim that a margin call occurred. That alone does not create a basis for federal subject-matter jurisdiction, because determining whether the arbitrator "fail[ed] to consider pertinent and material evidence" "plainly [does] not require resolution of a uniquely federal issue." *Greenberg*, 220 F.3d at 27 (internal quotation marks omitted). In reality, no question of federal law is "actually disputed" here. *Grable*, 545 U.S. at 314. We agree with the District Court that the fundamental dispute is not legal at all, but is factual: "no party contests the existence, applicability, or construction of these statutes and regulations. Instead, the Goldmans argue that the panel erred in its factual determination that no margin call occurred." (App. 13.) Finally, we are concerned that sweeping this kind of run-of-the-mill arbitration dispute into federal court would upset the "prominent role" that state

---

the continuing validity of manifest disregard as a basis for vacatur.

27

courts "play as enforcers of agreements to arbitrate" under the FAA. *Vaden*, 556 U.S. at 59. Expanding federal question jurisdiction to contractual disputes like this one runs the risk of "disturbing [the] congressionally approved balance of federal and state judicial responsibilities." *Grable*, 545 U.S. at 314.

## 2. FINRA Rules as Federal Law

The Goldmans' second argument for why they satisfy the well-pleaded complaint rule is that FINRA is a self-regulatory organization authorized by the '34 Act, and thus the alleged violations of FINRA rules raise questions of federal law. The '34 Act, they say, provides for pervasive federal oversight of self-regulatory organizations' internal rules, *see* 15 U.S.C. § 78s(b)(2)(C), and, consequently, allegations of procedural irregularities in the FINRA proceedings implicate substantial questions of federal law.

As support, the Goldmans rely principally on the decision of the United States Court of Appeals for the Second Circuit in *NASDAQ OMX Group, Inc. v. UBS Securities, LLC*, 770 F.3d 1010 (2d Cir. 2014). In that case, a divided panel of the Second Circuit held that there was federal question jurisdiction to review an arbitration, reasoning that the SEC's pervasive regulation of NASDAQ as a self-regulatory organization resulted in NASDAQ rules being intertwined with federal law. The *NASDAQ* case arose from serious problems in Facebook's initial public offering, which led UBS to initiate arbitration on state law contract and tort claims based on NASDAQ's alleged failure to follow its own rules. *Id.* at 1013-15. When NASDAQ sought declaratory judgment in federal court to preclude arbitration, one main

issue was whether the case implicated federal question jurisdiction. The Second Circuit concluded that it did, even though the allegations arose from NASDAQ rules and New York common law. The Second Circuit pointed out that NASDAQ was a registered national exchange under 15 U.S.C. § 78f, and thus was required to have "rules ... designed to prevent fraudulent and manipulative acts and practices [and] to promote just and equitable principles of trade ... ." 15 U.S.C. § 78f(b)(5). Because NASDAQ's rules were pervasively regulated under the '34 Act, and because they were meant to implement '34 Act obligations, the court ruled that those federal law obligations were necessarily involved in the arbitration that UBS initiated. *NASDAQ*, 770 F.3d at 1021-23. As to the substantiality component of the test for federal question jurisdiction, the Second Circuit determined that

> the disputed federal issue in [the] case – whether NASDAQ violated its Exchange Act obligation to provide a fair and orderly market in conducting an IPO – is sufficiently significant to the development of a uniform body of federal securities regulation to satisfy the requirement of importance to the federal system as a whole.

*Id.* at 1024 (internal quotation marks omitted). Finally, the court ruled that asserting jurisdiction would not upset the federal-state balance because of "Congress's expressed preference for alleged violations of the Exchange Act, and of rules and regulations promulgated thereunder, to be litigated in a federal forum." *Id.* at 1030.

None of that, though, changes the outcome here. We agree with the District Court that, even if the *NASDAQ* opinion's theory of federal question jurisdiction is correct,[14] its facts are easily distinguishable from the Goldmans' case because it "involved far more substantial questions of federal law." (App. 15.) Of high importance to the Second Circuit's substantiality analysis was that NASDAQ was an exchange, implicating the "central role stock exchanges play in the national system of securities markets." *NASDAQ*, 770 F.3d at 1024. The proper functioning of a national securities exchange, especially when it comes to its core function of properly issuing stock, is clearly a much more significant

---

[14] Because the Goldmans' claims are not nearly as substantial for jurisdictional purposes as those in the *NASDAQ* case, we need not reach the question of whether we would adopt the Second Circuit's analysis of federal question jurisdiction from the *NASDAQ* opinion. We do note, however, that the dissenting opinion in *NASDAQ* makes a compelling argument that "NASDAQ is a shareholder-owned, publicly-traded, for-profit company," "its rules are not federal regulations or federal law," and "the rules of a stock exchange are contractual in nature and within the province of state law." 770 F.3d at 1036 (Straub, J., dissenting). As with the Goldmans' case, "[t]he only arguably federal issue present" in the *NASDAQ* case was "a broad duty found in the Exchange Act" that was "not actually disputed." *Id.* The strong dissenting argument in *NASDAQ* suggests that the case was at the borderline of raising a sufficiently substantial issue of federal law to justify federal question jurisdiction. The Goldmans' claims much less directly implicate federal securities regulation, so that if *NASDAQ* is close to the border of satisfying the *Grable* test, the Goldmans are far from it.

issue of federal securities law than the arbitration procedures of a non-exchange self-regulatory organization.

"The substantiality inquiry ... looks ... to the importance of the issue to the federal system as a whole." *Gunn,* 133 S. Ct. at 1066. It "primarily focuse[s] not on the interests of the litigants themselves, but rather on the broader significance ... for the Federal Government." *Id.* The Goldmans raise a routine claim for vacatur alleging arbitrator and counterparty misconduct, which is, at bottom, a commonplace state law contract dispute. Unlike the *NASDAQ* case, which implicated the proper functioning of a major national securities exchange, nothing about the Goldmans' case is likely to affect the securities markets more broadly. That the allegedly misbehaving arbitration panel happened to be affiliated with a self-regulatory organization does not meaningfully distinguish this case from any other suit alleging arbitrator partiality in a securities dispute. Accordingly, we decline to recognize federal question jurisdiction over the flood of cases that would enter federal courts if the involvement of a self-regulatory organization were itself sufficient to support jurisdiction. *See Grable*, 545 U.S. at 318 (expressing concern with finding a substantial federal question in a state law claim when that "would have meant a tremendous number of cases" could enter federal court).

## IV.   Conclusion

For the foregoing reasons, we will affirm the District Court's order dismissing the Goldmans' suit for lack of subject-matter jurisdiction.